UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
VASILIS BACOLITSAS and SOFIA NIKOLAIDOU,

7158 Civ. 09 (PKC)

Plaintiffs,

-against-

86th & 3rd OWNER, LLC and MICHAEL, LEVITT
& RUBINSTEIN, LLC, as ESCROW AGENT,

**AFFIDAVIT IN OPPOSITION
TO PLAINTIFFS' MOTION AND
IN SUPPORT OF DEFENDANTS'
CROSS-MOTION**

Defendants.

-------------------------------------------------------------------x

STATE OF NEW YORK      )
                       )  ss.:
COUNTY OF NEW YORK  )

BRYAN CHO, being duly sworn, deposes and says:

1.      I am Vice-President of defendant 86th & 3rd Owner, LLC (the "Sponsor") and

submit this affidavit (a) in opposition to plaintiffs' motion for summary judgment pursuant to

which plaintiffs claim to be entitled under the Interstate Land Sales Full Disclosure Act (15

U.S.C. §1701, et seq.) (the "Disclosure Act" or the "Statute") to "revoke" a contract of sale (the

"Contract") which had been terminated due to their default months before their current claims

were asserted, and (b) in support of defendants' cross-motion for summary judgment dismissing

the Complaint, and awarding the Sponsor the reasonable attorneys' fees incurred by it in this

action as provided for in the Contract.  I am fully familiar with the facts set forth herein.

**Preliminary Statement**

2.      The Brompton is a new 20 story luxury condominium building (the "Building")

developed by the Sponsor, an affiliate of The Related Companies, L.P., one of the premier real

estate developers in New York City and throughout the country.  Located on 85th to 86th Street

and 3rd Avenue in Manhattan, with an address of 205 East 85th Street, the Building contains 164

residential condominium units where the prices range from $635,000 to over $13 million.

3.       Plaintiffs, Greek nationals who reside in Greece, have brought this lawsuit, not

because of any fault of the Sponsor or any problem in the Building, but rather, because of the

downturn in the national economy.  Specifically, plaintiffs had entered into the Contract to

purchase Unit 20A in the Building (the "Unit") for a purchase price of $3,400,000.  However,

after defaulting on their contractual obligations during the financial downturn, plaintiffs (and

other purchasers represented by the same counsel) attempted to find some basis to get back the

down payment they made (the "Deposit") and leverage their position with the Sponsor.  On May

3, 2009, an article appeared in the *New York Times* (Ex. 1), stating that the downturn "has caused

angst among a group of buyers *who are looking for price concessions or a chance to back out of*

*their contracts without losing their deposits*. Last week, Adam Leitman Bailey ...[plaintiff's

counsel here] began circulating the first of a series of lawsuits he planned to file on behalf of 17

buyers in contract at the Brompton who have refused to close without concessions from the

sponsor. They cite falling Manhattan market values . . ." (emphasis added).  This lawsuit is

precisely what the article described -- a bald faced effort to concoct some alleged reason -- any

reason -- for plaintiffs to get out of the Contract.[1]

---

[1] I note that the assertion of the Disclosure Act claims here is merely the latest tactic employed by plaintiffs' counsel to try to financially pressure the Sponsor. In addition to this action, he has brought five other lawsuits, each in New York State Supreme Court, County of New York,  on behalf of purchasers at The Brompton looking to escape their obligations: Salvatore v. 86th & 3rd Owner, LLC et al., index no. 106355/09; Bhavsar  v. 86th & 3rd Owner, LLC et al., index no. 106569/09;  Hsu W. 86th & 3rd Owner, LLC et al., index no. 106568/09 ); Baba v. 86th & 3rd Owner, LLC et al., index no. 106567/09 and  Aligory Business LTD  v. 86th & 3rd Owner, LLC et al., index no. 601824/09. The plaintiffs in the Salvatore, Bhavsar, and Hsu actions all sought temporary restraining orders and preliminary injunctions to prevent the Sponsor from reselling their units after they, too, defaulted, to try to pressure the Sponsor into refunding their deposits.  However, once their applications for temporary restraining orders were denied, those plaintiffs all ultimately discontinued their actions.  In the Aligory action, the plaintiffs tried another tactic: they filed Notices of Pendency against the units involved.  The Sponsor's motion to vacate these notices because they were without any basis, was granted by decision dated February 1, 2010.  It appears that plaintiffs' counsel, unable to pressure the Sponsor by tying up units through injunctions and notices of pendency, is trying a new legal theory to pressure the Sponsor -- by alleging Disclosure Act claims, which also totally lack merit.

4.    The latest set of claims asserted by plaintiffs' counsel is that plaintiffs are entitled to rescission and recovery of their Deposit because the Contract "violated" sections 1703(d)(1) and (d)(3) of the Disclosure Act.  However, as demonstrated below and in defendants' accompanying memorandum of law (the "Memorandum"), there is no merit whatsoever to these claims and defendants, rather than plaintiffs, are entitled to summary judgment and the dismissal of the Complaint

5.    As set forth in the Memorandum, the purpose of the Disclosure Act is to prevent interstate fraud in the sale of undeveloped land by requiring developers of real estate to provide full and fair disclosure of material information concerning the land to purchasers.  Developers of most condominium projects with over 100 units, such as The Brompton, are required under the Statute and the detailed regulations (the "Regulations") developed by the Department of Housing and Urban Development ("HUD") to register their projects with the Federal Office of Interstate Land Sales Registration.[2]  As part of the registration, developers must file for review and acceptance by this agency a Statement of Record, which contains, among many things, copies of the proposed offering plan and the proposed form of the contract of sale, as well as a property report which must be given to all potential purchasers before they enter into a contract and which contains the numerous disclosures and specific warnings about the project mandated by the

---

[2] In addition to this filing, all sponsors of condominium plans in New York, pursuant to the Martin Act, New York General Business Law 352-e, et seq., must file proposed plans with the Office of the New York State Attorney General, which, pursuant to the extensive regulations it has developed thereunder, 13 NYCRR Part 20, performs an extensive review of all offering plans.  Only after a plan is determined to be acceptable and approved by the Attorney General's Office is a sponsor permitted to enter into contracts for the sale of units in the condominium. Consistent with this legal requirement, The Brompton's Condominium Plan, including all of its related documents such as the form of contract to be used to convey units, were submitted to, extensively reviewed, and ultimately approved and accepted for filing by, the Attorney General's Office on June 29, 2007.  Only after this approval by the Attorney General's Office, and only after HUD accepted the filing of these same documents without making a finding that they were in any way not in compliance with the Disclosure Act, did the Sponsor begin entering into contracts for the sale of units in The Brompton.

Regulations.  In fact, if the property report is not given to them, purchasers have a right under the Disclosure Act to rescind their contracts.

      6.     Here, the Sponsor fully complied with all of its obligations under the Statute by (i) registering the development with HUD, and (ii) filing all of the documents and information that comprise a Statement of Record, including the form of contract to be used and a property report (the "Property Report") containing the disclosures mandated by the Disclosure Act that were applicable to this project.  All of these documents were submitted to HUD for review and, as HUD never advised the Sponsor after its review that any of the documents were incomplete, inaccurate in any material respect, or otherwise not in compliance with the Statute, the registration subsequently became effective.  After that, the Sponsor, in compliance with its obligations under the Statute, provided all purchasers, including plaintiffs, with copies of the Property Report, the form of contract that had been included in the Statement of Record, and the Condominium Plan, itself.  (A copy of the Contract, the Amendment to the Contract, the Property Report and relevant pages from the Condominium Plan are annexed as Exhibits 2, 3, 4 and 5 respectively.)

      7.     Notwithstanding the Sponsor's full compliance, and notwithstanding the fact that the Contract was terminated by reason of their default, plaintiffs now assert that they are entitled to rescission under the Disclosure Act.  In viewing the claims asserted, it bears emphasis that this lawsuit *is entirely lawyer generated.*  In fact, although the thrust of the Complaint centers on what was and was not contained in the Property Report, the Condominium Plan and the Contract, plaintiffs testified at deposition that they either did not read at all, or had no recollection of reading, any portion of the Property Report or the Condominium Plan. See Ex. 6 at 16-17; Ex. 7

at 27-29.[3] And with respect to the Contract, itself, plaintiffs testified that whatever they did not understand in the Contract they referred to their then lawyer and the lawyer explained everything to them (Ex. 7 at 32-33).

8.      At their depositions, plaintiffs were not even able to describe the nature of their claims in this lawsuit. Plaintiff Nikolaidou testified that she had never even read the Complaint (Ex. 6 at 40-41) and did not know the nature of the claims that had been brought in her name in this lawsuit ("Q. I would like you to tell me your understanding of the nature of the claims that have been brought in your name in this litigation." "A. I can't tell you because I don't know") (Id. at 41). Plaintiff Bacolitsas, in turn, testified that at some point his counsel informed him that the building was misdescribed in the materials he was given (which, as noted, he had not even read) and that all of his knowledge of the alleged misdescription was based solely on what his counsel had told him ( "Q. Is there anything you are aware of where the sponsor mis[de]scribed the building in any materials you were given?" "A. I am not aware of that detail" . . . "Q. Is all your information based on what your lawyer told you?" "A. Yes") (Ex. 7 at 56).[4] Thus, in examining the claims in the Complaint, the Court should remember that plaintiffs concede they were in no way misled and that it is their lawyers who have totally concocted these claims.

9.      As to the specifics of the claims, plaintiffs first assert that their Contract is revocable under section §1701(d)(1) of the Statute, which provides that a contract is revocable if it does not contain "a description of the lot which makes such lot clearly identifiable and which is in a form acceptable for recording". However, contrary to plaintiffs' assertion, the Contract did identify exactly what plaintiffs were purchasing as it specified the precise unit that was being

---

[3] Exhibit 6 is comprised of excerpts of the deposition taken in this action of plaintiff Sofia Nikolaidou, while Exhibit 7 is comprised of excerpts of the deposition taken in this action of plaintiff Vasilis Bacolitsas.

[4] In light of their testimony, we submit that it is no accident that plaintiffs' moving papers fail to contain an affidavit from either of plaintiffs.

purchased (Unit 20A) in the precise building that was being constructed. Thus, there is no question that what was being purchased was clearly identifiable.

10.     Moreover, the Contract was also clearly in a form acceptable for recording. As explained in the accompanying affidavit of Martin Kravet, Esq., President of Royal Abstract of New York LLC, one of the leading title insurance agencies in New York City, and an expert with extensive knowledge and experience in the recording of legal instruments affecting real property in New York, the Contract was fully capable of being recorded against the tax lot numbers on which the condominium building was being built.[5] Thus, by definition, the Contract fully complied with the language of the Statute as it clearly identified the Unit and was in "a form acceptable for recording."[6]

11.     Stripped of the excess verbiage, plaintiffs' claim is simply that the Contract is revocable because it did not contain the particular tax lot number of the Unit being purchased. However, not only did that not affect the "recordability" of the Contract but, as detailed in the Memorandum, under New York law, tax lot numbers for the individual units in a new condominium can *never* be obtained until *after* the building is fully built. Specifically, under New York's condominium law, it is only once (i) contracts for 15 percent of the condominium units are fully executed; (ii) the condominium plan is thereafter declared effective; (iii) the

---

[5]  Every piece of real property in New York, including, for example, the Federal Courthouse on Pearl Street, has a block and tax lot number. Upon the establishment of a condominium, the existing tax lot (or lots) on which the building is located is divided up into smaller tax lots -- one for each apartment so that in the case of a 50 unit building, where one tax lot existed before, there would now be 50 separate tax lots. By law, those tax lot numbers are not and cannot be assigned by the City of New York until the building is built and the condominium declaration and certified "as built" floor plans are filed.

[6]  Besides requiring the Contract to clearly identify the Unit, the Statute requires only that it be in a "form" for recording. As noted above, the form of the contract and legal description of the property to be used for the sale of all units in the Brompton was submitted as part of the Statement of Record to HUD. Not surprisingly, at no time did HUD ever inform the Sponsor that these materials were not in material compliance with the Statute. This is because the form of Contract does, in fact, provide a legal description of the Unit that contains all of the information which is available under New York law before the condominium building is fully built.

building is constructed, and (iv) the declaration of condominium is filed, together with a verified statement of a registered architect or licensed engineer certifying that the floor plans filed with it "fully and fairly depict the layout, location, unit designations and approximate dimensions" of the units "as built", that tax lot numbers for the units can be obtained from the Real Property Assessment Bureau of the City of New York, the office which assigns tax lot numbers for all real property, including individual units in new condominium buildings.  As a result, no builder of a new condominium in New York can ever supply a tax lot number for a unit to any purchaser who signs a contract before the building is constructed.

12.     Because of this, *were this Court to accept plaintiffs' contention that the absence of a tax lot number for the Units at the time the Contract was signed violated the Disclosure Act, no condominium subject to the Statute (i.e., virtually any development with over 100 units) could ever be developed in New York as plaintiffs' position would, in effect, convert every preconstruction contract into nothing but a two year purchase option.*[7]  As discussed below, with no binding contracts in place, under the guidelines of the federally backed mortgage company, Fannie Mae, which is responsible for the vast majority of mortgages, no purchaser would ever be able to obtain financing  for the purchase of his or her unit.  With purchasers unable to obtain financing, no developer would be able to proceed with any sizeable project.

13.     In fact, not only is the Disclosure Act clear that contracts need only be in form acceptable for recording -- something the Contract at issue plainly satisfies --but as the Memorandum explains, the Regulations HUD developed to achieve the purpose and intent of the Statute demonstrate that it was well aware that in many jurisdictions tax lot numbers cannot be

---

[7] Presumably for this reason, my counsel has informed me that they are unaware of any reported decision, and plaintiffs have cited none, where any court has accepted the argument being advanced here by plaintiffs, which, as noted, would effectively bring any new condominium construction and financing to a complete halt.

assigned during construction and thus, will not be available at the time contracts are entered into.

HUD's Regulations make crystal clear that there is a distinction between the information

necessary to *record* a *contract* as distinct from what is required to *convey* a unit by *deed*. As

noted, for a *contract* to purchase a unit in a not yet built condominium to be *recorded*, the tax lot

number of the unit -- which has not yet been assigned and which, therefore, cannot be contained

in the contract -- is not necessary because the contract can be recorded against the existing tax lot

number(s) of the property on which the condominium building is being constructed. By contrast,

in order to *convey* a particular unit once the condominium has been constructed, the *deed* must

contain the tax lot number of that particular unit. As detailed below and in the Memorandum, in

recognition of this difference -- a difference which plaintiffs wholly ignore and which alone is

dispositive -- HUD's Regulations instruct developers in jurisdictions such as New York to

comply with the Statute by making in the Property Report those specific disclosures set forth in

the Regulations advising purchasers that all of the legal information necessary for *conveying* the

unit is not yet available. *Nowhere* do the Regulations state that the failure to have the declaration

recorded and to have tax lot numbers for the individual units available at the time of contract

violates the Disclosure Act or makes the contract revocable thereunder. Nor do the Regulations

instruct developers to advise in the Property Report that purchasers have a two year right of

revocation because all of the information necessary for *conveyance* cannot yet be obtained.

Here, as the Property Report plainly shows, the Sponsor made all of the disclosures which were

mandated by the Disclosure Act as well as the Regulations.

14.     Plaintiffs' second claimed Disclosure Act violation under 1703(d)(1) is similarly

without merit. Specifically, plaintiffs' contention appears to be that the Unit was somehow

"misdescribed" because, even though *all* documents correctly stated that the real property on

which the condominium building was being constructed consisted of three parcels, and even

though the proper tax lot numbers of the three parcels were correctly delineated in *all* of the

relevant documents, one of the pages furnished to plaintiffs (an exhibit to the proposed

declaration) stated that Parcel 1 -- comprised of tax lots 4, 45, 46, 47 & 48 -- included the space

that lied "90.52 above the plane" (i.e., 90.52 above ground level), when what should have been

stated was that it included the space that lied 90.52 feet above *and below* the plane. This

"argument" is totally specious, especially given that a building can obviously not commence in

mid-air and further, because, as set forth below, all of the Plan documents made clear that the

condominium building included two commercial units that were located precisely in the area

90.52 feet below the plane (i.e., at ground level).

      15.     Even if this were not the case, plaintiffs' argument is absurd for any number of

reasons.  As detailed below, plaintiffs, by their own admission, were not confused or misled by

any claimed difference in the property description, as they testified that they never read either the

Plan or the Property Report, and their counsel explained to their satisfaction any items in the

Contract which they had not understood.  Thus, they *concede* that they did not rely on any

property description in making their decision to purchase.  Even if they had read these materials,

plaintiffs would not have seen a misdescription because *all* of the documents, including the

Condominium Plan, the Property Report, and the text of the proposed declaration itself, *correctly*

delineated precisely what parcels and, more particularly, what lots were included.  Thus, what

plaintiffs are now complaining about was totally immaterial.  At least as importantly, the

inadvertent omission of the words "and below" can in no way constitute a violation of

§1701(d)(1) as it in no way impacted on the ability to record plaintiffs' Contract at the time of

signing against the existing tax lots -- all of which were properly set forth; nor was plaintiffs'

interest in the Unit misrepresented.  In short, nothing altered the fact that, in the language of the Statute, the description of the Unit was in a *form acceptable for recording*.

16.    Plaintiffs' final claimed Disclosure Act violation is, like the others, totally misplaced.  This time plaintiffs claim that the Contract violated §1703(d)(3) because it contained an alternative liquidated damages clause whose applicability depended on whether the Disclosure Act applied to the particular purchaser.  In fact, here too, the Sponsor is in full compliance as the Contract, in section 12(d), contained the specific terms required by the Statute -- that in the event of purchaser's default, the amount of the liquidated damages to which the Sponsor was entitled would be the greater of 15% of the purchase price or the Sponsor's actual damages.  Because individual purchasers, depending on their circumstances, might be exempt from the Statute, the form contract also included an alternative liquidated damages provision that allowed the Sponsor to collect liquidated damages of 20% of the purchase price from purchasers who were exempt from the Statute.  I understand that nothing in the Statute or the Regulations prohibits the inclusion of such an alternative damages clause in the Contract applicable to purchasers exempt from the Statute.  Finally, as the form of contract containing these alternative clauses was submitted to HUD, and as HUD never notified the Sponsor that the form was deficient in any way, there is no question that the Contract does not violate the Statute.

17. As the Sponsor fully complied with §1703(d) of the Disclosure Act, plaintiffs' motion should be denied and defendants' cross-motion for summary judgment should be granted.

**Background**

18.  Plaintiffs, together with 125 other purchasers, contracted to purchase their luxury units at The Brompton.[8]  On May 21, 2008, plaintiffs executed the Contract to purchase Unit

---

[8] The building originally contained 193 units being offered for sale.  However, as the result of the combination of various apartments, there are currently 164 separate residential units in the building.  Since February 2009, when

20A for a price of $3,400,000. (Ex. 2)  At that time, plaintiffs made an initial deposit of $340,000

with escrow agent, defendant Michael, Levitt & Rubenstein, LLC  (the "Escrow Agent"),[9] which

amount was to be applied to the purchase price at the closing for the Unit.  In November 2008, at

plaintiffs request, the Sponsor agreed to an amendment of the Contract permitting plaintiffs to

make the second deposit required thereunder in two payments -- one in the amount of $170,000

on December 15, 2008, and a second, also in the amount of $170,000, by March 15, 2009 (the

"Amendment"). (Ex. 3)  Plaintiffs made the December 15, 2008 payment and, as a result, had on

deposit with the Escrow Agent a total of $510,000, or 15 percent of the Contract price.

19.    In the first half of 2009, a number of purchasers, including plaintiffs, unhappy

with the direction of the economy, retained Mr. Bailey's firm to attempt to obtain price

concessions from the Sponsor or to find a basis for backing out of their contracts and recovering

their deposits.  See Ex. 1, as well as the March 8, 2009 article from the *New York Times* (Ex. 8):

> "'Behind this, the big elephant in the room is the price', said Adam Leitman
> Bailey, a real estate lawyer who says he is representing unhappy buyers from
> nearly 50 buildings. The traditional method for a buyer to break a contract is to
> prove that some element of a completed unit differs from the developer's offering
> plan. This is why lawyers have been known to use lasers to measure square
> footage to within a millimeter and to debate descriptions of views and amenities."

20.    Plaintiffs testified that as a result of seeing this article in the New York Times,

they retained Mr. Bailey. (Ex. 7 at 50-52).  On March 11, 2009, their attorney called the

Sponsor's counsel and asked for a $600,000 reduction in the purchase price.  The Sponsor

summarily rejected the request, whereupon plaintiffs failed to make the last payment of the

---

closings first began, there have been closings of over 100 unit purchases, at a total value in excess of $300 million,
and there have been no material complaints concerning the building from any of these purchasers as all are
extremely happy with their purchases.

[9] As is typical in these situations, the Escrow Agent is the Sponsor's real estate closing counsel.

Deposit required by the Contract.  Consequently, on March 24, 2009 the Sponsor sent plaintiffs

a notice of cancellation terminating the Contract for the failure to make this payment. (Exhibit 9)

21.    Thereafter, by letter dated April 8, 2009 (Exhibit 10), plaintiffs' counsel made a

formal application to the New York State Attorney General's office for a determination that

plaintiffs were entitled to revoke the Contract and to the return of their Deposit.[10]  By letter dated

May 6, 2009 (Exhibit 11) the Sponsor responded and explained to the Attorney General that

because it was plaintiffs who had defaulted, the Sponsor was entitled to plaintiffs' Deposit.  *On

January 15, 2010, the Attorney General issued his Determination of the Disposition of Down

Payment and  finding that plaintiffs' rescission claims were devoid of merit, directed the Escrow

Agent to release the $510,000 Deposit to the Sponsor.* (Exhibit 12)   Pursuant to the direction of

the Attorney General, the Escrow Agent thereafter did so.

22.    On July 27, 2009, more than four months after the Sponsor terminated the

Contract because of plaintiffs' default, and more than three months after filing their complaint

with the Attorney General, plaintiffs' counsel wrote to the Sponsor to advise it that plaintiffs

were purporting to "revoke" the Contract, this time based on the Disclosure Act.  The Complaint

in this action followed soon thereafter.  (Exhibit 13)  Defendants timely filed their answer

(Exhibit 14), which contains two counterclaims: one for judgment entitling the Sponsor to the

Deposit by reason of plaintiffs' default and second, for all attorneys' fees incurred by the

---

[10]  That request was made pursuant to 13 NYCRR § 20.3(o)(3)(viii)(a) which provides that in the event a dispute arises regarding the down payment, "the sponsor <u>shall</u> apply and the purchaser or the escrow agent holding the down payments in escrow <u>may</u> apply to the Attorney General for a determination on the disposition of the down payment and any interest earned thereon" (emphasis added). Thus, plaintiffs had the option either to have their assertion that they were entitled to revoke the Contract and have the Deposit returned to them -- the very relief sought in this litigation -- decided by the Attorney General or to have it decided judicially. They opted for the former course.

Sponsor in this lawsuit as expressly provided for in paragraph 35 of the Contract.[11] Plaintiffs

served their reply on or about October 20, 2009. (Exhibit 15)

     23.     As set forth below, the Disclosure Act claims in the Complaint, which plaintiffs'

counsel concocted long after plaintiffs defaulted and the Contract was terminated, are totally

baseless. Because the Sponsor fully complied with its obligations under the Statute, including

the use of a contract that satisfied the Disclosure Act's requirements, (a) plaintiffs' motion for

summary judgment should be denied, and (b) defendants' cross-motion for summary judgment

dismissing the Complaint and awarding the Sponsor its attorneys' fees should be granted.

### The Complaint Should Be Dismissed Because The Sponsor Has Complied With The Disclosure Act's Requirements

     24.     The Disclosure Act was enacted in the late 1960's to prohibit interstate fraud in

the land sale industry by ensuring full disclosure to purchasers of undeveloped property[12] so they

could make an informed decision about whether to purchase. HUD, the agency responsible for

seeing that the Statute's intent is carried out, developed the extensive set of Regulations to

instruct developers how to comply with the Statute.

     25.     Under the Statute and the Regulations, the sponsor of a new condominium is

required to register its proposed development with HUD by filing a document called a

"Statement of Record," which must contain extensive information concerning the real property

and numerous related documents concerning the sponsor and the condominium project, such as,

the form of purchase contract buyers will execute to acquire units; a legal description of the

---

[11] As the Escrow Agent, pursuant to the direction of the Attorney General, recently released the $510,000 Deposit to the Sponsor, the first counterclaim is now moot. Thus, the only affirmative relief sought by the Sponsor at this point is recovery of the attorneys' fees it has incurred due to plaintiffs' default.

[12] The Statute contains a list of exemptions, such as for projects with fewer than 100 units or involving only sales to purchasers within the same state. Since virtually every New York project of over 100 units involves sales to non-residents, virtually every new condominium project in this State of this size must comply with the Disclosure Act.

property and a deed showing that the sponsor has title to the property. The Statute provides that once filed, HUD reviews these materials to determine if they are "incomplete or inaccurate in any material respect" and if they are, HUD issues the sponsor a suspension notice stating what revisions must be made before the registration can become effective.

26.     Included in the Statement of Record is a document called the "Property Report," which is required to contain extensive information from the Statement of Record concerning the development, as well as certain other information and warnings to purchasers which the Regulations may require for the particular project. Only after the Statement of Record, including the proposed form of contract and the Property Report, are reviewed and accepted for material compliance by HUD, and thus become effective, is a sponsor then permitted to begin marketing condominium units in the development to be built. The Statute and Regulations also require the sponsor to provide the Property Report to all purchasers before they receive and execute the form of contract which HUD has reviewed and if the sponsor fails to do so, the purchaser will have grounds for rescinding the contract over the next two years.

27.     Here, the Sponsor fully complied with the Statute and the Regulations, as it filed a Statement of Record containing all of the information and materials required, including the form of contract to be used and a proposed Property Report. After receiving such materials, HUD never sent a suspension notice to the Sponsor identifying any non compliance in the documents. As a result, the registration became effective and the Sponsor commenced sales of units in the Condominium, making sure that it provided every prospective purchaser with the Property Report and the accepted form of contract.

28.     Notwithstanding the foregoing, in an attempt to find some way to get out of their obligations under the Contract, plaintiffs contend that they are entitled to rescission because the

Contract supposedly did not satisfy §§1703(d)(1) and 1703(d)(3) of the Statute in three separate ways. As discussed below and in the Memorandum, these claims are utterly baseless.

**A.     The Description Of Plaintiffs' Unit In The
        Contract Made It Clearly Identifiable And
        It Was In A Form Acceptable For Recording**

29.     Section 1703(d)(1) of the Disclosure Act allows a purchaser to revoke its contract within two years after execution if the contract does not contain "a description of the lot [unit] which makes…[it] clearly identifiable and which is in a form acceptable for recording…." Plaintiffs assert that the Contract failed to satisfy this requirement, and therefore contend that they (and presumably any other purchaser) have a right to rescind under the Statute.

30.     However, the description in the Contract clearly identified plaintiffs' Unit -- the Contract described the Unit designated 20A delineated on the floor plans for the Condominium contained in the Plan, which had already been filed with both HUD and the New York State Attorney General's Office, and which was given to plaintiffs and every other purchaser before they signed their contracts. (See Exs. 2 and 5). In fact, the Condominium Plan, which is incorporated into the Contract by reference, contains the specific floor plan of the Unit, the dimensions and locations of the rooms and windows within the Unit, the specific floor on which the Unit is located and what portion of the floor the Unit is located on, as well as the directions that the Unit faces. (See Ex. 5, at 305-320). With this information, plaintiffs knew precisely what they were purchasing.

31.     Further, plaintiffs' assertion that the absence of a tax lot number for the particular unit kept the Contract from being in form acceptable for recording, is just plain wrong for numerous reasons. First, as explained in the accompanying Kravet Affidavit and in the Memorandum, the Contract was entirely capable of being *recorded* in the land records of New

York County when plaintiffs signed it. Specifically, the Plan, incorporated by reference into the Contract, describes the building which is to contain the Unit as being erected on the parcels of real property designated as Section 5, Block 1531, Lots 4, 6, 43, 45, 46, 47 and 48 in the Borough of Manhattan, City of New York, County of New York. Just like any other purchase contract, lease or other legal document giving a person an interest in specific real property located in the County, the Contract could have been recorded against such tax lots, giving plaintiffs a lien against that property to the extent of their interest in the Unit to be constructed thereon as identified in the Contract by the specific unit number. Indeed, it is precisely because the Contract was recordable against the existing tax lots of the Condominium Building, that the Sponsor included a non-recordation provision in Section 31 of the Contract stating: "Purchaser may not record this Agreement or a memorandum thereof." The Property Report also confirms that the Contract would be recordable except for its recordation prohibition.[13] (See Ex.4 at 6). In the absence of this provision, plaintiffs, and all of the other unit purchasers, could have recorded the Contract and thereby obtained a lien against the Condominium Building's real property.

32.     Second, the Contract was, in fact, in "a form acceptable for recording", subject only to the addition of the actual tax lot number for the Unit -- again, information that was not available until the Building was built and the declaration filed and approved. Stated simply, the Disclosure Act requires only that the Contract be in "form acceptable for recording" -- which does not preclude the absence of certain specific information to be added at a subsequent point. Here, the *form* of the description contained in the Contract was certainly acceptable as the form

---

[13] In conformity with the usual practice, the Sponsor included a non-recordation provision in the Contract here because the recordation of an individual purchaser's contract would place a lien against the property and would constitute a default under the Sponsor's construction loan documents. Further, the existence of such liens would make the closings of every unit much more difficult and expensive because the Sponsor and purchaser would need to obtain waivers of every purchasers' lien against the property each time there was a closing for the purchase of an individual unit. In no place do the Regulations prohibit or restrict the use of such a non-recordation provision, and, in fact, they specifically contemplate its use. See Regulation 1710.109(d)(1). We note that plaintiffs are not complaining about the existence of this provision.

of contract was typical and HUD never notified the Sponsor (or to my knowledge anyone else for that matter) that it found the *form* of Contract, including the *form* of legal description of the unit, to be materially inadequate under the Statute and the Regulations.

33.     Further, contracts in New York City for the purchase of a unit in a condominium building under construction (like the contracts at The Brompton) *cannot, by definition,* ever contain lot numbers for the units being purchased.  As explained in the Memorandum, under New York law, lot numbers are assigned to units only after a sponsor files and records the condominium declaration, and the building is actually built.  To be able to file the declaration and obtain tax lot numbers for particular units, a sponsor must also file with the New York City Register the building's floor plans accompanied by a verified statement of a registered architect or licensed engineer certifying that these floor plans "fully and fairly depict the layout, location, unit designations and approximate dimensions" of the units "as built." Only after this filing is reviewed and accepted by the Real Property Assessment Bureau of the City of New York is the declaration recorded and are individual tax lot numbers assigned for each condominium unit. Because of this, no contract for the purchase of a unit in a condominium building being constructed in New York City can ever, by definition, contain the recording information for the declaration or the tax lot number for the specific unit being purchased.

34.     *I underscore that the very situation which plaintiffs are challenging here is the same one that occurs every time a new condominium is built in New York City (as well as many other localities).  Thus, it is not at all surprising that the Statute and the Regulations do not require that the lot number for the particular unit being sold be contained in the contract, but instead, specifically provide what disclosures must be made when lot numbers are unavailable.*

35.     Clearly, HUD was aware of the issue created by the laws of many local jurisdictions and to accomplish the purpose and intent of the Statute -- stopping fraud in interstate land sales by making sure that full disclosure of all relevant and necessary information is given to prospective purchasers -- it included in the Regulations the specific disclosures that developers need to provide when lot numbers cannot be provided under state law at the time of contract.  As the Court can see, Regulations 1710.100 et seq. detail the items, the disclosures and the warnings that a sponsor must include in its Statement of Record and Property Report.  For example, Regulation 1710.109, "Title to the property and land use", describes the various statements that the developer must include on these issues and at subdivision (g)(1), entitled "Plats", states:

> (ii) Have plats covering the lots in this Report been recorded? . . .
> If they have not been recorded, is the description of the lots given
> in this Report legally adequate for the conveyance of land in the
> jurisdiction where the subdivision is located?  If it is not, include a
> statement to the effect that the description of the lots is not legally
> adequate for the conveyance of the lots and that it will not be until
> the plat is recorded.[14]

36.     The agency recognized that in many jurisdictions, such as New York, the plans and "plats" for the condominium will not have been recorded (because they cannot be) and the division of the condominium building's existing lots into separate tax lots for each condominium unit will not have occurred (because state law proscribes it) at the time the contract is entered into, and, as a consequence, the legal description of the units may not be legally adequate for conveyance of the units.  Because of this, rather than prohibit a sponsor from entering into

---

[14]  In strict compliance with the regulations, the Property Report (Ex. 4 at 10) discloses that "[t]he Floor Plans and Declaration [of Condominium] are subject to the review and approval of the Real Property Assessment Bureau of the City of New York ('RPAB')" and on the following page, in bold block capital letters, it states: "Neither the floor plans nor the declaration have been submitted to the RPAB. Until the floor  plans are filed and recorded the description of the units is not legally adequate for the conveyance of the units. Thereafter each unit will be legally described by reference to its unit and tax lot number as set forth in the recorded declaration and filed floor plans."

contracts until the conveyable description is obtainable (i.e., upon the completion of construction), and rather than instruct a sponsor to tell purchasers that they have a two year right to revoke under §1703(d)(1), the Regulation simply instructs sponsors to include a statement in the Property Report which advises purchasers that the declaration has not been recorded and the legal description is not yet legally adequate for conveyance of the Units. Here, the Sponsor followed the instructions in this Regulation to the letter and included such a statement in the Property Report. (See Ex. 4 at 9-10).[15]

37.    It bears emphasis that, as counsel has advised me, the Regulations do not in any place prohibit contracts in developments where a legal description of the unit sufficient for conveyance cannot yet be obtained under the law of the local jurisdiction. Nor do the Regulations anywhere state that such contracts at all violate the Disclosure Act. Most significantly, however, the Regulations do *not* require sponsors to advise purchasers in the Property Report, in the contract, or any place else, that when the full legal description of the unit needed for *conveyance* is unavailable at the time of contract, the purchaser has a two year right of revocation under section 1703(d).

38.    In contrast, the Regulations do require sponsors to include, in *both* the Property Report and the contract, statements which advise purchasers that (a) in all events they have an absolute right to revoke the contract within seven days after signing, and (b) if they were not provided with a copy of the Property Report before signing the contract, they have a two year right of revocation. Here, the Sponsor did provide such statements. As stated above, because the Contract was recordable using the description then available, the Sponsor had no reason to, and did not, advise purchasers of a revocation right under §1703(d).

---

[15] Set forth in the Memorandum are a number of other examples in the Regulations regarding the disclosures required when the declaration cannot be recorded before contracts are signed.

39.    At bottom, plaintiffs are trying to confuse the Court by conflating (a) the language in Section 1703(d)(1) providing a purchaser with a right of revocation if the *contract* is not in form acceptable for *recording*, with (b) the language of the Regulations setting forth the disclosure that must be given if the legal description then available is insufficient for a *deed* to *convey* the unit.  However, there is no basis for this argument and the very fact that the Statute and the Regulations use different terms shows that they were intended to deal with different issues.  Section 1703(d)(1) makes clear that it must be evident from the contract what it is that the purchaser is contracting for: the unit must be identifiable and the contract must be in such a "form" that it can be *recorded*.  That is clearly the case here as the Contract *is* in form that can be recorded.  In sharp contrast, the Regulations spell out that if the unit cannot be *conveyed* until individual tax lot numbers have been assigned, there is no statutory violation, but the sponsor must give notice of that fact in the Property Report.  Neither the Statute nor the Regulations, nor anything else for that matter, even suggest that if a sponsor makes the disclosures in the contract and the Property Report required by the Regulations, a purchaser still has the right to revoke his contract.  It makes no sense at all to suggest that after a sponsor makes all these required disclosures, a purchaser would nevertheless have the same two-year right to revoke as if the Property Report was never delivered.

40.    By making the required filings and disclosures to purchasers when the full conveyable legal description is unavailable, sponsors satisfy the requirements of the Disclosure Act and, as long as the contract contains a description that allows it to be recorded, have no need to advise purchasers of a 1703(d) revocation right.  Indeed, it is my understanding that the way every condominium development in New York with over 100 units complies with the Statute is by making in its Property Report the disclosures set forth in the Regulations concerning unit

conveyances.  Again, it bears emphasis that if the Court were to accept plaintiffs' contentions here, the construction of new condominiums in New York would be virtually halted.  There are few, if any, developers who could ever obtain adequate financing from lenders to develop a project without the ability to obtain binding contracts during construction.

41.     Moreover, few, if any, purchasers would be able to obtain a mortgage enabling them to purchase a unit.  Under the guidelines issued by Fannie Mae, the government backed mortgage financing company that is ultimately responsible for insuring over seventy percent of all residential mortgages, no lender may give a mortgage for the purchase of a condominium unit unless seventy percent of the units in the condominium have already closed or are under a binding contract.  (See http://online.wsj.com/article/SB123733304341863319.html) ("The government-backed mortgage-finance company [Fannie Mae] stopped guarantying mortgages in condo buildings where fewer than 70% of the units have been sold, up from 51%. . . Fannie says the new rules protect borrowers from buying units in buildings that have a high risk of failure").  Thus, if plaintiffs' interpretation of the Disclosure Act were accepted and all purchasers in New York had a two year right of revocation for their contracts, it would be nearly impossible for any purchaser to obtain a mortgage in a newly developed condominium in New York because the condominium, by definition, could not obtain binding contracts for any of the units -- let alone for 70 percent of the units -- until long after it was completed.  With both purchasers and developers largely unable to obtain financing, new condominium construction would cease.  Obviously, and as the Regulations clearly indicate, such a result was never the intention of the Statute.  Given the profoundly negative impact that acceptance of plaintiffs' contentions in this action concerning the Disclosure Act would have on the entire condominium industry, coupled

with a complete lack of support for their position, plaintiffs' motion should be rejected and summary judgment granted to Sponsor.

### B. The Claimed Misdescription of the Condominium Lots

42.     Plaintiffs' second claimed Disclosure Act violation under 1703(d)(1) appears to be that the building in which their Unit was located was somehow "misdescribed" because even though *all* documents correctly stated that the property on which the Building was being built consisted of three parcels, and even though the proper tax lot numbers of the three parcels were correctly delineated in *all* of the documents, in one of the pages furnished to plaintiffs (an exhibit to the proposed declaration) it was stated that Parcel 1 -- which is comprised of tax lots 4, 45, 46, 47 & 48 -- included the space in those lots that lied at "90.52 above the plane" (i.e., 90.52 above ground level) when what should have been stated was that it included the space in those lots that lied 90.52 feet above the plane and below. This "argument" is totally specious, especially given that a building can obviously not commence in mid-air and further because all of the Plan documents made crystal clear that the Building included two commercial units which were located precisely in that area below 90.52 feet (i.e., at ground level).

43.     Moreover, as discussed above, the Statute requires that the legal description in the Contract be in a *form* capable of being recorded. Here, the language in *all* of the documents correctly recited the existing tax lot numbers for the property on which the Building was located. Thus, the inadvertent omission of the words "and below" in no way changed, or at all affected, the Unit plaintiffs were purchasing or its description. That Unit remained identifiable and the Contract was in form acceptable for recording. Equally important is the fact that there is no way plaintiffs can claim they were in any way misled or harmed by what they are complaining about or that the absence of the words "and below" was in any way material to their purchase,

particularly in light of their sworn testimony that they did not even read the materials and that the only information they had respecting the Building was what their counsel told them (Ex. 6 at 16-18, 40-41; Ex. 7 at 32-33, 56).

44.     Wholly apart from that testimony, the Condominium Plan, including the proposed declaration itself, made perfectly clear in numerous places that the land on which the Condominium is to be located is comprised of *all* of the lots, *including all* of lots 4, 45, 46, 47 and 48 (i.e., the space that was in the area that was 90.52 feet above the plane, as well as the space below that plaintiffs contend had been excluded). See, e.g., Ex. 5 at 16, 31 ("The Land . . . consists of Block 1531, Lots 4, 6, 43, 45, 46, 47 and 48").  Further, the Plan made clear in numerous places that the Condominium would contain the two commercial units on the ground floor in those very areas of the corner portion of the property that were below the area which was 90.52 feet "above the plane". See, e.g., Ex. 5 at 17 (Setting forth that the Condominium would include two commercial units and the location of those units); Ex. 5 at 34 ("The Condominium will also initially include 2 Commercial Units -- Commercial Unit 1 which will be located on the 1st floor and cellar level of Building A and Commercial Unit 2 which will be located on the 1st floor and cellar level of Building A"); Ex. 5, Articles 3 and 4 at 372 (Again stating that the Property includes the two commercial units each on a portion of the "Cellar Floor, First Floor and Mezzanine" of the Building); Ex. 5 at 291-293 (The floor plans for the Cellar and First floors of the Building -- showing exactly where the Commercial Units would be located).  The Plan, therefore, fully disclosed what property the Condominium would contain.

45.     Finally, not only is what plaintiffs are complaining about immaterial, and not only did plaintiffs not rely to their detriment on any claimed discrepancy but, if anything, under plaintiffs' contention, they were now receiving even *more* than they originally bargained for --

the inclusion of the ground floor level -- even though there was no increased property taxes or

expenses.  Certainly, under these circumstances plaintiffs cannot show that there was a *material*

*adverse* change which they relied upon to their detriment.

**C.    The Contract Satisfied The**
       **Requirements of §1703(d)(3)**

46.    Plaintiffs' third and final contention is that they are entitled to rescind the

Contract under §1703(d)(3) and Regulation 1715.4(b).  This section of the Statute states that

contracts must provide:

> that, if the purchaser or lessee loses rights and interest in the lot as
> a result of a default or breach of the contract or agreement which
> occurs after the purchaser or lessee has paid 15 per centum of the
> purchase price of the lot, excluding any interest owed under the
> contract or agreement, the seller or lessor (or successor thereof)
> shall refund to such purchaser or lessee any amount which remains
> after subtracting (A) 15 per centum of the purchase price of the lot,
> excluding any interest owed under the contract or agreement, or
> the amount of damages incurred by the seller or lessor (or
> successor thereof) as a result of such breach, whichever is greater,
> from (B) the amount paid by the purchaser or lessee with respect to
> the purchase price of the lot, excluding any interest paid under the
> contract or agreement.

47.    The obvious purpose of this section is to make sure that for sales subject to the

Disclosure Act, a sponsor cannot obtain from defaulting purchasers more than 15 percent of the

purchase price or, if greater, the actual damages sustained as a result of the default.  Here, the

language of the Contract totally satisfied both the Statute and the Regulations as it plainly states

in section 12(d)(1):

> to the extent that the sale of the Residential Units is not exempt
> from the provisions of the Interstate Land Sales Full Disclosure
> Act, the amount of the Deposit to be retained by the Sponsor upon
> Purchaser's failure to cure a default ... will be the greater of (i)
> fifteen percent (15%) of the Purchase Price (excluding any interest
> owed) or (ii) the amount of damages incurred by Sponsor due to
> the default.

48.    Nevertheless, plaintiffs still assert that the Contract does not comply with the Statute because it also contains, in section 12(c), an alternative liquidated damages provision that would be applicable only in the event the Disclosure Act did not apply to the plaintiffs' purchase of the Unit.  This alternative provision allows the Sponsor to recover liquidated damages upon a purchaser's default in the amount of twenty percent of the purchase price.  According to plaintiffs' Complaint, by merely having these alternative clauses in it, the Contract does not comply because a buyer may be "confused" or misled concerning his rights.

49.    Once again, plaintiffs' contention has no basis whatsoever.  Plaintiff Bacolistas testified that he did not recall even having an understanding as to how much of a deposit he would forfeit if he defaulted under the Contract and he was not confused about anything relating to the Contract after his lawyer provided advice and explanations of its terms. (Ex. 7 at 69-70).  That alone should be the end of the inquiry.  Moreover, as discussed above, the form of the Contract containing these alternative damages clauses was submitted to HUD and HUD never issued the Sponsor a notice stating that the form was materially deficient in any way.  Further, the inclusion of such alternative liquidated damages clauses in the form of contract is by no means unusual and is, in fact, necessary given that the form of contract to be used for all sales must be submitted both to HUD at the time the development is registered and at or about the same time to the New York State Attorney General's Office for its approval before any sales can take place.  It is important to understand that even though an overall development may be subject to the Disclosure Act and therefore registered with HUD, individual purchasers may still fall within one of the regulatory exemptions to the Statute and not be subject to its requirements.  Because of this, the form to be submitted as part of the Statement of Record when filing with

HUD needs to contain both clauses since either may be applicable, depending on the status of the purchaser.

50.     For example, under the Regulations, a unit sold to a person who is engaged in a bona fide land sales business is exempt from the Statute (Reg. 1710.14(a)(3)), and HUD's Guidelines to the Statute and the Regulations (published at http://www.hud.gov) state that the exemption is to be applied on a "lot by lot basis" -- a contract by contract basis.  Thus, depending on the purchaser, the appropriate liquidated damages would be different.  For those covered by the Disclosure Act, the 15% limitation would apply while for those purchasers who are exempt, the 20% liquidated damages provision would apply.  Accordingly, the form contract which had to be submitted to HUD and the New York State Attorney General for approval, of necessity, contained such alternative provisions in 12(c) and 12(d).

51.     As the Property Report given to each purchaser here clearly indicates that the development is covered by the Disclosure Act,[16] purchasers knew when they signed their contracts that the Act and, therefore, the 15% liquidated damages clause in 12(d), applied unless they themselves were specifically exempt.  Whether they were exempt would depend on information within their own knowledge, not the Sponsor's, and therefore, there is no way the alternative clauses could be confusing or misleading to an individual purchaser.[17]

---

[16] For example, not only does the front page of the Property Report indicate that "Federal Law requires that you receive this Report prior to signing a contract or agreement to buy or lease a lot in this subdivision" but the last two pages clearly reflect that the Property Report has been filed with HUD and that "[if] any representations are made to you which are contrary to those in this Report, please notify HUD Interstate Land Sales/RESPA Division".

[17] Any claim of confusion is belied by the plain and direct language in the Property Report (Ex. 4 at 7) -- given to plaintiffs before they signed the Contract -- which states that "if you paid fifteen (15%) of the purchase price *or more* at the time of your default and you lose the right to purchase the Unit, you may be entitled to a refund of a portion of your deposit(s) if and to the extent required under Section 1703(d) of the Interstate Land Sales Full Disclosure Act. *Under 1703(d) of the Interstate Land Sales Full Disclosure Act, we must refund to you the remaining amount of the total deposit(s) after subtracting the greater of (i) 15 percent of the purchase price (excluding any interest owed) and (ii) the amount of the actual damages resulting from the default incurred by us*" (emphasis added).

52.     As the Contract contained the precise provision required by the Disclosure Act, plaintiffs' claim that they are entitled to revocation under §1703(d)(3) should be dismissed.

### Defendants are Entitled to Summary Judgment Dismissing
### the Complaint and Awarding the Sponsor its Attorneys' Fees

53.     As there is no merit to plaintiffs' claims, their motion for summary judgment should be denied, and defendants' cross-motion for summary judgment dismissing the complaint should be granted.  Moreover, as paragraph 35 of the Contract obligates plaintiffs to reimburse the Sponsor for the legal fees and disbursements the Sponsor incurs in defending its rights under the Contract, summary judgment should be entered on the Sponsor's counterclaim for an award equal to the amount of the legal fees and disbursements it has incurred in this action.

## CONCLUSION

WHEREFORE, (a) plaintiffs' motion for summary judgment should be denied, and (b) defendants' cross-motion for summary judgment dismissing the Complaint and awarding the Sponsor its legal fees and costs should be granted.

_____
BRYAN CHO

Sworn to before me this
__ day of March, 2010

_____
Notary Public

MARK WALFISH
Notary Public, State of New York
No. 4606693
Qualified in Westchester County
Commission Expires March 30, 19
Oct 31, 2013