UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x

VASILIS BACOLITSAS and SOFIA NIKOLAIDOU,                    :          7158 Civ. 09 (PKC)

                                        Plaintiffs,         :

                    -against-
                                                           :

86th & 3rd OWNER, LLC and MICHAEL, LEVITT
& RUBINSTEIN, LLC, as ESCROW AGENT,                        :

                                        Defendants.         :

--------------------------------------------------------------------------------x


**DEFENDANTS' MEMORANDUM OF LAW IN (A) OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND (B)
SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY
JUDGMENT**


KATSKY KORINS LLP
Attorneys for Defendants
605 Third Avenue
New York, NY 10158
212 953-6000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ................................................................................................................. 10

AS THE SPONSOR HAS COMPLIED WITH THE
STATUTE'S REQUIREMENTS, THE COMPLAINT
SHOULD BE DISMISSED AND SUMMARY JUDGMENT
GRANTED IN FAVOR OF THE SPONSOR ............................................................... 10

A.   The Contract Contained A Description Of
      Plaintiffs' Unit That Made It Clearly Identifiable
      And Was In A Form Acceptable For Recording ................................................ 12

B.   The Claimed Misdescription of the Condominium Lots ................................... 21

C.   The Contract Satisfied The Requirements of §1703(d)(3) ................................ 24

CONCLUSION .............................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

*Cases*

*Bryan v. Amrep Corp.*, 429 F. Supp. 313, 317 (S.D.N.Y. 1977) ..........................................23

*EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 Sup. Ct. 295, 307 (1980) .....................16

*Gibbes v. Rose Hill Plantation Development Company*, 794 F. Supp.
1327, 1334 (D. So. Carolina 1992) ....................................................................23

*Joeveer v. 1800 Club, Ltd.*, No. 1:08-cv-20412-AJ (S.D. Fl. 2008)....................................20

*Maguire v. Southern Homes of Palm Beach*, 591 F. Supp. 2d 1263 (S.D. Fla. 2008).........................10

*Murray v. Holiday Isle, LLC*, 620 F. Supp. 2d 1302 (S.D. Ala. 2009)....................................21

*Paquin v. Four Seasons of Tennessee, Inc.*, 519 F. 2d 1105, 1109
(5th Cir. 1975), <u>cert</u> <u>denied</u>, 425 U.S. 972, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976) ...........23

*Price v. Owens-Illinois Development Co.*, 646 F. Supp. 314, 316 (M.D. Ga. 1986)...........................23

*Pugliese v. Pukka Development, Inc.*, 550 F.3d 1299, 1305 (11th Cir. 2008).....................................16

*Stefan v. Singer Island Condominiums Ltd.*, 2009 WL 426291, at p. 8 (S.D. Fla. 2009)....................23

*Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 852 (11th Cir. 2009)....................................2

*Weiss v. Alard*, 150 F. Supp. 2d 577 (S.D.N.Y. 2001) ....................................................14

*Winter v. Hollingsworth Properties, Inc.*, 777 F. 2d 1444 (11th Cir. 1985)...........................10

*Statutes, Regulations and Other Authorities*

Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, <u>et seq</u>....................................1

15 U.S.C. §1702 ..............................................................................................10

15 U.S.C.§1703(c) ...........................................................................................21

15 U.S.C. 1703(d) ........................................................................................*passim*

15 U.S.C. §§1704-1706 ......................................................................................10

15 U.S.C.§1705(2)...........................................................................................10

# TABLE OF AUTHORITIES

15 U.S.C. §1706(b) ........................................................................................ 3, 10, 15

15 U.S.C. §1707(a) ................................................................................................. 11

15 U.S.C. § 1719 ...................................................................................................... 9

New York General Business Law 352-e, et seq. ..................................................... 3

New York Real Property Law §291-c ................................................................... 13

New York Real Property Law §294 ................................................................. 13, 14

New York Real Property Law 339-d, et seq. .......................................................... 4

New York Real Property Law § 339-o ........................................................ 5, 12, 19

New York Real Property Law §339-p .............................................................. 15, 16

24 CFR §1710.1 et.seq. ................................................................................... passim

24 CFR §1710.14(a)(3) .......................................................................................... 26

24 CFR 1710.45(a) ........................................................................................... 3, 10

24 CFR §1710.105-118 ........................................................................................... 11

24 CFR § 1710.105(c) ...................................................................................... 11, 18

24 CFR §1710.109 ................................................................................................. 15

24 CFR §1710.109(d)(1) ........................................................................................ 14

24 CFR §1710.109(d)(1)(iv) .................................................................................. 13

24 CFR §1710.208(d)(2) ........................................................................................ 18

24 CFR §1710.209(a)(4)(i) .................................................................................... 18

24 CFR §1710.209(a)(5) ........................................................................................ 18

24 CFR §1710.209(g)(1)(ii) ................................................................................... 17

24 CFR §1715.4(b) ................................................................................................ 24

## TABLE OF AUTHORITIES

13 NYCRR Part 20 ..................................................................................................................3

13 NYCRR § 20.3(o)(3)(viii)(a) ...........................................................................................9

H.R. Rep. No. 96-154 at 33-36 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2317, 2353 .........13

***Rules***

Federal Rule of Civil Procedure 12(b)(6) ............................................................................20

This memorandum is submitted on behalf of defendants 86th & 3rd Owner, LLC (the "Sponsor") and Michael, Levitt & Rubinstein, LLC (a) in opposition to plaintiffs' motion for summary judgment based on their claim that they are entitled under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, et seq. (the "Disclosure Act" or "Statute"), to revoke a contract of sale which had been terminated due to their default months before their current claims were asserted, and (b) in support of defendants' cross-motion for summary judgment dismissing the Complaint, and awarding the Sponsor on its counterclaim the reasonable attorneys' fees it has incurred in this action as provided for in the contract of sale.

## PRELIMINARY STATEMENT

As the result of the downturn in the economy in 2008, plaintiffs decided in March 2009 to renege on their contract (the "Contract") (Ex. 2) to purchase unit 20A (the "Unit") at the Brompton, a new luxury condominium building containing 164 residential condominium units developed by the Sponsor.[1] Through this lawsuit, plaintiffs are attempting to find some basis to get back the $510,000 deposit (the "Deposit") they made toward the purchase price of the Unit.

Plaintiffs defaulted by refusing to make the final $170,000 payment toward the Contract Deposit by March 15, 2009, as required by an amendment to the Contract that they had requested. As a result, the Sponsor terminated the Contract and asserted its right to retain the Deposit as liquidated damages. Four months later, plaintiffs' counsel suddenly dreamed up a new legal theory and on August 13, 2009 plaintiffs commenced this action alleging for the first time that they are entitled to rescind the Contract under the Disclosure Act. As the United States Court of Appeals for the Eleventh Circuit recently observed, "[a]fter the housing bubble burst", buyers who have had "second thoughts about their decision to purchase a condominium unit"

---

[1] The relevant facts are set forth in the accompanying affidavit of Bryan Cho and all exhibit references herein are to the exhibits attached to that affidavit.

and "[w]anting out of their contract" have "seized on to . . . the [Disclosure Act], a federal statute that has become an increasingly popular means of channeling buyer's remorse into a legal defense to a breach of contract claim." *Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 852 (11th Cir. 2009) (rejecting buyer's claim).

Plaintiffs have now moved for summary judgment on their newfound Disclosure Act claims, asserting that they are entitled to rescission because the Contract "violated" sections 1703(d)(1) and (d)(3) of the Disclosure Act. As demonstrated below, there is simply no merit whatsoever to these claims and the Sponsor, rather than plaintiffs, is entitled to summary judgment and the dismissal of the Complaint. Specifically, developers of most condominium projects with over 100 units, such as The Brompton, are required under the Statute and the detailed regulatory scheme established by the Department of Housing and Urban Development ("HUD") through the regulations it promulgated in implementation of the Statute (24 CFR §1710.1 et seq.) ( "Regulations" or "Regs"), to register their projects with the Federal Office of Interstate Land Sales Registration. As part of the registration, developers must file for review and approval by HUD a Statement of Record which contains, among many things, copies of the proposed offering plan and the proposed form of the contract of sale, as well as a document entitled "Property Report" which must be given to all potential purchasers before they enter into a contract and which contains the numerous disclosures and specific warnings about the project mandated by the Regulations. If the Property Report is not given to purchasers, purchasers have a right under the Disclosure Act to rescind their contracts within two years of signing.

Here, the Sponsor fully complied with all of its obligations under the Statute by (i) registering this condominium development with HUD, and (ii) filing all of the documents and information that comprise a Statement of Record, including the form of contract to be used and a Property Report containing the disclosures mandated by the Disclosure Act that were applicable

to this project.  As HUD did not find that any of these documents were non-compliant with the Statute  (see 15 U.S.C. 1706(b) and Reg. 1710.45(a)), the registration became effective.  The Sponsor, consistent with its obligations, thereafter provided all purchasers, including plaintiffs, with copies of the Property Report, a contract in the form of the contract of sale included in the Statement of Record, together with the Condominium Plan itself.[2]

Notwithstanding the Sponsor's full compliance, and notwithstanding the fact that the Contract was terminated by reason of their default, plaintiffs nevertheless assert that they are entitled to rescission under §1703(d)(1) and (d)(3) of the Disclosure Act for three separate reasons -- none of which have any legal support and all of which are utterly devoid of merit. First, plaintiffs point to Disclosure Act §1703(d)(1), which provides that a contract is revocable if it does not contain "a description of the lot which makes such lot clearly identifiable and which is in a form acceptable for recording".

However, contrary to plaintiffs' assertion, the Contract did identify exactly what plaintiffs were purchasing as it specified the precise Unit being purchased (Unit 20A) in the precise building that was being constructed.  Thus, what was being purchased was clearly identifiable.  Moreover, the Contract was in form acceptable for recording. As explained in the accompanying affidavit of Martin Kravet, Esq., President of Royal Abstract of New York, LLC, one of the leading title insurance agencies in New York City, and an expert with extensive knowledge and experience in the recording of legal instruments affecting real property in New York, the Contract was fully capable of being recorded in the land records of New York County

---

[2] In addition to the Disclosure Act's requirements, New York State has an extensive statutory scheme governing the sale of condominium units pursuant to which the Office of the New York State Attorney General, as provided by the Martin Act, New York General Business Law 352-e, et seq., and the extensive regulations it has developed thereunder, 13 NYCRR Part 20, supervises the filing and approval of condominium plans and must perform an extensive review of the content of all condominium offering plans before a Sponsor is permitted to enter into any contracts for the sale of condominium units.  Consistent with this legal requirement, The Brompton's Condominium Plan and all related documents were submitted to, extensively reviewed and ultimately approved and accepted for filing by, the Attorney General's Office on June 29, 2007.

against the tax lot numbers of the property on which the condominium building was being built.[3] (Kravet Aff. ¶ 7). Indeed, as set forth *infra*, the case law to this effect is totally consistent and plaintiffs have cited absolutely no law -- none -- in support of their irresponsible position.

Not only are plaintiffs incorrect when they assert that the absence of a separate tax lot number for the Unit at the time of contracting gave rise to a revocation right for plaintiffs (and presumably any other purchaser as well), but the absurdity of plaintiffs' argument is highlighted by the fact that, as detailed below, under New York's condominium laws, tax lot numbers for the individual units can be obtained only *after* the Building is built.[4] Thus, New York State law, by definition, makes it impossible for any contract for the purchase of a unit in a condominium building under construction in New York City to ever contain a tax lot number for that unit.

Given the restrictions imposed by New York law, if the Court were to accept plaintiffs' contention that the absence of a tax lot number for the Unit at the time the Contract was signed violated the Disclosure Act, *no condominium subject to the Statute (i.e., virtually any development with over 100 units) could ever be developed in New York because plaintiffs' position would, in effect, convert every preconstruction contract into nothing but a two year purchase option.* Indeed, as discussed below, with no binding contracts in place, under the guidelines of the federally backed mortgage company, Fannie Mae, which is responsible for

---

[3] Every piece of real property in New York has a block and tax lot number, including, for example, the Federal Courthouse on Pearl Street, which has its own block and tax lot number. Upon the establishment of a condominium, the existing tax lot (or lots) on which a building is located is divided up into smaller tax lots -- one for each apartment so that in the case of a 50 unit building, where one tax lot existed before, there would now be 50 separate tax lots. By law, those tax lot numbers are not and cannot be assigned by the City of New York until the building is built and the condominium declaration is filed. New York Real Property Law 339-d, et seq.

[4] Specifically, as detailed below, under State law, it is only once (i) contracts for 15 percent of the units in the Building are fully executed; (ii) the condominium plan is thereafter declared effective; (iii) the Building is constructed, and (iv) the declaration of condominium, including the floor plans for the building, is filed together with a verified statement of a registered architect or licensed engineer certifying that the floor plans "fully and fairly depict the layout, location, unit designations and approximate dimensions" of the units, "*as built*", that tax lot numbers for the units can be obtained from the Real Property Assessment Bureau of the City of New York, which assigns tax lot numbers for all real estate including individual units in new condominium buildings.

insuring the vast majority of mortgages, no purchaser would ever be able to obtain financing necessary for the purchase of a unit. And with purchasers unable to obtain financing, no developer would be able to proceed with any sizeable project.

Not only does the language of the Disclosure Act provide plaintiffs with no support for their position but the HUD Regulations offer none either. Indeed, the Regulations reflect that HUD was well aware that in many jurisdictions a condominium declaration cannot be recorded and tax lot numbers cannot be assigned during construction and thus, such information will not be available at the time contracts are entered into. HUD's Regulations make crystal clear that there is a distinction between the information necessary to *record* a *contract* as distinct from what is required to *convey* the Unit by *deed*. As noted, under New York law, for a *contract* to be *recorded* in an as yet built condominium, the tax lot number of the particular unit -- which has not yet been assigned and which therefore cannot be reflected on the contract -- is not necessary because the contract can be recorded against the existing tax lot number(s) of the property. By contrast, for a *deed* to *convey* a particular unit once the building is constructed, the deed must contain the tax lot number of that particular unit. [5]

In recognition of this difference -- a difference which plaintiffs wholly ignore and which alone is dispositive -- the HUD Regulations instruct developers in jurisdictions such as New York to comply with the Statute by making in the Property Report specific disclosures, set forth in the Regulations, advising purchasers that all of the legal information necessary for *conveying* the unit is not yet available. *Nowhere* do the Regulations state that the failure to have the declaration recorded and to have tax lot numbers for the individual units available at the time of

---

[5]  Wholly ignoring the difference between the two, plaintiffs repeatedly cite to, and rely upon, New York Real Property Law § 339-o (Pl. Br. at 1, 12, 13, 14, 15, 17, 18). However, that section by its terms is applicable only to *deeds conveying* (or certain leases for) condominium units. That section in no way deals with *contracts* which, as noted, are recordable against the existing block and lot numbers of the property. And of course § 1703(d)(1) -- the Statute section at issue -- addresses only the recordability of contracts -- not what must be contained in deeds.

contract violates the Disclosure Act or makes the contract revocable under it.  Nor do they instruct developers to advise in the Property Report that purchasers have a two year right of revocation because all of the information necessary for *conveyance* cannot yet be obtained. Here, the Contract was in fact recordable and, as the Property Report plainly shows, the Sponsor made all of the disclosures mandated by the Disclosure Act as well as by the Regulations. Consequently, there is simply no merit to plaintiffs' contentions  (see pp. 12 - 21, <u>infra</u>).

Plaintiffs' second claimed Disclosure Act violation under §1703(d)(1) is similarly without merit. Specifically, plaintiffs' contention appears to be that the building in which their Unit was located was somehow "misdescribed" even though *all* documents correctly stated that the property on which the building was being constructed consisted of three parcels, and even though the proper tax lot numbers of the three parcels were correctly delineated in *all* of the documents.  Plaintiffs' make this claim solely because on one of the pages furnished to plaintiffs (an exhibit to the proposed declaration) there was a statement that said Parcel 1 -- comprised of tax lots 4, 45, 46, 47 & 48 -- included the space that lied "90.52 above the plane" (i.e., 90.52 above ground level), when what should have been stated was that it included the space that lied 90.52 feet above and *below* the plane.  This "argument" is totally specious, especially given the fact that a building can obviously not commence in mid-air and further, because, as set forth *infra*, all of the Plan documents repeatedly made clear that the building included two commercial units that were located precisely in the area below 90.52 feet (i.e., at ground level).

Even if this were not the case, plaintiffs' argument is absurd for any number of other reasons.  First, as detailed below, plaintiffs, by their own admission, were in no way confused or misled by any claimed difference in the property description, as they testified that they never read either the Plan or the Property Report and that their counsel explained to their satisfaction any items in the Contract which they did not understand upon first reading it. Thus, they *concede*

that they in no way relied on any description in the Plan or the Contract of the real property on

which the building was being built in making their decision to purchase.  And even if they had

read any of the materials, plaintiffs would have seen that there was in fact no misdescription

because *all* of the documents, including the Condominium Plan and the Property Report, as well

as the text of the proposed declaration itself, *correctly* delineated precisely what parcels, and

more particularly what lots, were included.  Thus, what plaintiffs are complaining about was

totally immaterial.  At least as importantly, the inadvertent omission of the words "and below"

cannot constitute a violation of §1701(d)(1) because it in no way impacted the ability to record

plaintiffs' Contract at the time of its signing against the existing tax lots -- all of which were

properly set forth; nor was plaintiffs' interest in the Unit misrepresented.  In short, it in no way

altered the fact that, in the language of the Statute, the description of the Unit was in a *form*

*acceptable for recording* (see pages 21 - 24, <u>infra</u>).

Finally, and similarly misplaced, is plaintiffs' contention that the Contract violated

§1703(d)(3) of the Disclosure Act because it contained alternative liquidated damages clauses,

whose applicability depended on whether the Disclosure Act applied to the particular purchaser.

In fact, the Sponsor fully complied with §1703(d)(3) by including all of the language required by

the Statute in section 12(d) of the Contract -- that in the event of purchaser's default, the amount

of the liquidated damages to which the Sponsor was entitled would be the greater of 15% of the

purchase price or the Sponsor's actual damages.  Because individual purchasers, depending on

their circumstances, might be exempt from the Disclosure Act, the form contract also included an

alternative provision allowing the Sponsor liquidated damages of 20% for those contracts that

were exempt from the Disclosure Act.  Nothing in the Statute or the Regulations in any way

prohibits the inclusion of such an alternative damages clause in the Contract applicable to

purchasers who are exempt from the Statute.  Moreover, as the Sponsor submitted the form of

contract containing these alternative clauses to HUD and HUD at no time notified Sponsor that the form was materially deficient, there is no question that the Contract does not violate §1703(d)(3) as plaintiffs claim. (see pages 24 - 26, infra).

*          *          *          *

It bears emphasis that plaintiffs have failed to cite any case law in support of any of their positions, i.e., plaintiffs cite no federal or state case (and we are aware of none) where a court held that a purchaser was entitled to a right of rescission under the Disclosure Act because of the things that plaintiffs are complaining of here. Plaintiffs' position, if accepted, would effectively prevent any new construction of sizable condominium projects in this State because developers could not build (and purchasers could not get financing to buy) if purchasers had contracts that they could revoke at any time. As the Sponsor fully complied with the Disclosure Act, plaintiffs' motion for summary judgment should be denied and the Sponsor's cross-motion for summary judgment should be granted.

## FACTS

On May 21, 2008, plaintiffs, two Greek nationals who reside in Greece, executed the Contract to purchase the Unit for $3,400,000 and made a deposit of $340,000 with the escrow agent, defendant Michael, Levitt & Rubenstein, LLC (the "Escrow Agent"). Under the Contract, plaintiffs were required to make a second $340,000 deposit on or before November 21, 2008. However, in an effort to accommodate plaintiffs, the Sponsor entered into an amendment to the Contract which provided that plaintiffs would be permitted to make the second deposit in two payments: $170,000 on December 15, 2008, and $170,000 by March 15, 2009, time being of the essence. (Ex. 3).[6] Plaintiffs made the first of these payments in December 2008, making the total

---

[6] This amendment also provided that there would be no notice or cure period allowed if plaintiffs failed to make either of these payments and that such failure constituted an immediate default allowing the Sponsor to terminate the

amount of their Deposit $510,000. However, plaintiffs failed to make the second $170,000 payment by March 15, 2009 and, instead, demanded a $600,000 price reduction, which the Sponsor summarily rejected. On March 24, 2009, the Sponsor sent plaintiffs a Notice of Cancellation of the Contract (Ex. 9) advising that the Contract was terminated and that the Sponsor was making a demand on the Escrow Agent for the delivery of the Deposit to the Sponsor.[7]

Four months later, plaintiffs' counsel suddenly came up with a whole new legal theory which plaintiffs had not presented to the Attorney General and in August 2009, commenced this action, alleging for the first time that plaintiffs were entitled to rescission of the already terminated Contract based on three claimed violations of §1703(d)(1) and §1703(d)(3) of the Disclosure Act.[8] As we now show, the Disclosure Act claims, concocted entirely by plaintiffs' counsel long after plaintiffs had defaulted and their Contract was terminated, are completely meritless. Thus, plaintiffs' motion should be denied and the Sponsor's cross-motion granted.

---

Contract and retain the Deposit.

[7] By letter dated April 8, 2009, plaintiffs' counsel submitted a formal application to the New York State Attorney General's office for a determination that plaintiffs were entitled to revoke the Contract and to the return of their Deposit. (Ex. 10) This was done pursuant to the State regulatory scheme which provides that a purchaser contending that it is entitled to the return of its down payment has the *option* of asking for such a determination from the Attorney General *or* pursuing judicial remedies. 13 NYCRR § 20.3(o)(3)(viii)(a). Plaintiffs elected the former course. We note that, inasmuch as the state courts have concurrent jurisdiction over Disclosure Act claims (15 U.S.C. § 1719), plaintiffs could have pursued *all* of its rescission claims -- whether State or Federal -- either in the New York State courts or in this Court. Plaintiffs, however, elected to seek the identical relief -- rescission of the Contract and the return of their down payment -- both before the New York State Attorney General as well as before this Court. In any event, the Sponsor responded to the Attorney General and explained that it was plaintiffs who had defaulted, and that therefore the Sponsor was entitled to plaintiffs' Deposit. (Ex. 11) *On January 15, 2010, the Attorney General issued his Determination of the Disposition of Down Payment (Ex. 12) and, finding that plaintiffs' rescission claims were devoid of merit, directed the Escrow Agent to release the $510,000 Deposit to the Sponsor,* which the Escrow Agent thereafter did.

[8] Defendants served an answer (Ex. 14) to the Complaint (Ex. 13) and the Sponsor interposed counterclaims for (i) damages in the amount of the $510,000 Deposit and (ii) as specifically provided for in paragraph 35 of the Contract, recovery of the attorneys' fees it has incurred due to plaintiffs' default, including the fees it incurs in this action. As the Escrow Agent, pursuant to the recent direction of the Attorney General, released the $510,000 Deposit to the Sponsor, the first counterclaim is now moot. Thus, the only affirmative relief the Sponsor now seeks is the recovery of its attorneys' fees. The parties have conducted and completed discovery and are all in agreement that there are no material facts in dispute and that the instant motion and cross-motion present solely legal issues.

## ARGUMENT

### AS THE SPONSOR HAS COMPLIED WITH THE STATUTE'S REQUIREMENTS, THE COMPLAINT SHOULD BE DISMISSED AND SUMMARY JUDGMENT GRANTED IN FAVOR OF THE SPONSOR

The Disclosure Act was enacted in the late 1960's to prohibit interstate fraud in the land sale industry by ensuring full disclosure to purchasers of undeveloped property[9] so they could make an informed decision about whether to purchase. See *Winter v. Hollingsworth Properties, Inc.*, 777 F. 2d 1444 (11th Cir. 1985); *Maguire v. Southern Homes of Palm Beach*, 591 F. Supp. 2d 1263 (S.D. Fla. 2008). HUD is the agency that was charged with developing and enforcing a regulatory scheme to effectuate the Statute's purpose and intent through the formulation of regulations that would advise real property developers how to comply with the Statute.

The Statute and the Regulations require developers to register their proposed real property developments, including condominium developments, with the Office of Interstate Land Sales Registration within HUD by filing a document entitled "Statement of Record," which must contain extensive information concerning the property and numerous related documents concerning the developer and the project. See 15 U.S.C. §§1704-1706.[10] Once filed, HUD reviews these documents to determine if they are "incomplete or inaccurate in any material respect." See §1706(b); Reg. 1710.45(a).[11] If any of the documents are incomplete or materially

---

[9]   The Statute does not apply to developments where construction has been completed or to projects with fewer than 100 lots or units. Section 1702 of the Statute contains a list of exemptions. Essentially, inasmuch as virtually every New York project of over 100 units involves sales to non-residents, virtually every new condominium project in this State of over 100 units is subject to the Disclosure Act.

[10]   Included among the information and documents required are: a legal description of the property to be developed (§1705(2)); a deed showing that the developer has title to the development property (§1705(8)); and a copy of "the forms of conveyance to be used in selling...lots to purchasers", i.e., the purchase agreements buyers are to execute (§1705(9)).

[11]   The Statute and the Regulations make clear that although HUD examines the materials for form and completeness, HUD does not verify the representations or other statements contained therein for factual accuracy.

inaccurate on their face, HUD issues a suspension notice informing the developer of the revisions that must be made before the registration can become effective. Id.

As part of the Statement of Record, the developer must also prepare a document entitled "Property Report," which has to contain certain required disclosures, certain items of information contained in the Statement of Record concerning the property to be developed, and such other information and warnings to purchasers as HUD's Regulations require. See 15 U.S.C. §1707(a) and Regs. §1710.105-118. Only after the Statement of Record and its component documents, including the proposed form of contract and the proposed property report, are reviewed and accepted for compliance by HUD, and thus become effective, is the developer then permitted to begin marketing lots or condominium units in the development to be built. The Statute and Regulations also require the developer to provide the Property Report to all purchasers before they receive and execute the form of contract which HUD has reviewed. If the developer does not, the purchaser will have grounds for rescission. Reg. § 1710.105(c).

Here, the Sponsor fully complied with the Statute and with HUD's extensive regulatory scheme by filing a Statement of Record containing all of the information and materials required, including the form of contract to be used and the Property Report. As HUD did not send a suspension notice identifying any non compliance in the documents, the registration became effective and the Sponsor commenced sales of condominium units, providing every prospective purchaser with the Property Report while using the accepted form of contract.

As part of their ongoing efforts to come up with some basis for purchasers to avoid their contractual obligations due to the downturn in the real estate market, plaintiffs' counsel now asserts that plaintiffs are entitled to rescission because the Contract allegedly in three respects did not meet the requirements imposed by §§1703(d)(1) and 1703(d)(3). We address each contention in turn.

A.     **The Contract Contained A Description Of
        Plaintiffs' Unit That Made It Clearly Identifiable
        And Was In A Form Acceptable For Recording**

Section 1703(d) of the Disclosure Act allows a purchaser to revoke its contract within

two years after execution if the contract does not contain certain specific provisions.  Section

1703(d)(1) requires the Contract to provide:

> a description of the lot [Unit] which makes such lot clearly
> *identifiable* and which is in a *form* acceptable for *recording* by the
> public official responsible for maintaining land records in the
> jurisdiction in which the lot is located; (emphasis added)

Here, plaintiffs assert that the Contract and the other documents provided to them, which

are incorporated by reference into the Contract, such as the Condominium Plan, failed to meet

such requirement because what they were purchasing was not identifiable and in a form

acceptable for recording.  In support of this argument, plaintiffs point out that under New York

Real Property Law §339-o, a condominium unit deed -- necessary to *convey* a unit -- must

contain the liber, page and date of recording of the condominium declaration, the block and tax

lot number of the unit, as well as its unit designation.  Because the condominium declaration here

had not been recorded at the time plaintiffs entered into the Contract (as explained below, it

could not have been under New York law), this information was not yet available and, therefore,

not contained in the Contract or anywhere else in the Plan's documents.  Thus, plaintiffs

conclude that because the tax lot number for the Unit was not contained in the Contract, the

Contract was not in a "form" acceptable for recording, thereby entitling them (and presumably

any other purchaser) to the right of rescission.

As a threshold matter, we note that the description in the Contract clearly identified

plaintiffs' Unit by describing it as the unit designated 20A delineated on the floor plans for the

Condominium contained in the Plan, which had already been filed with both HUD and the New

York State Attorney General's Office, and which was given to plaintiffs and every other purchaser before they signed their contracts.  In fact, the Condominium Plan, incorporated into the Contract by reference (Ex. 2, Sect. 11.2), contains a specific floor plan of the Unit, the dimensions and locations of the rooms and windows within it, the specific floor on which the Unit is located, what portion of the Floor it is located on, as well as the directions that it faces. (Ex. 5, at 341-342). Thus, plaintiffs knew precisely what they were purchasing.

Moreover, at the time plaintiffs signed, the Contract was, in fact, entirely capable of being *recorded* in the land records of New York County.[12] Specifically, the Plan, incorporated into the Contract by reference, describes the building which is to contain the Unit as being built on the parcels of real property designated as Section 5, Block 1531, Lots 4, 6, 43, 45, 46, 47 and 48 in the Borough of Manhattan, City of New York, County of New York. (Ex. 5, pp. 16-17; 31-35; 397-398)  Just like any other purchase contract or legal document giving a person an interest in specific real property located in the County, the Contract could have been recorded against such block and tax lots, giving plaintiffs a lien against that real property to the extent of their interest in the Unit to be constructed thereon as identified in the Contract by its specific unit number. See New York Real Property Law §294. (See Kravet Aff. ¶7).  As set forth in the Real Property Law and as explained in the accompanying Kravet Affidavit, an executory contract for the purchase or sale of an interest in real property in New York may be recorded in the land records of the county where the property is located. Id. §§291-c and 294 (See Kravet Aff. ¶6). The right of the purchaser to performance under such a contract is enforceable against anyone who, subsequent to its recording, acquires all or any portion of the real property covered by the

---

[12] As correctly noted by plaintiffs in their brief (at 11), the legislative purpose for mandating that the contract be capable of recordation was to ensure "...that purchasers may publicly record and thus protect their interests in their lots." H.R. Rep. No. 96-154 at 33-36 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2317, 2353. To the same effect, see, e.g., Regulation 1710.109(d)(1)(iv) making clear that the very purpose of Section 1701(d)(1) "is to protect the purchaser from claims of later purchasers or creditors".

recorded contract and further gives the purchaser a lien in the amount of any payments made under the contract prior to conveyance of title. Id. §294(4) (See Kravet Aff. ¶7).

It is precisely because the Contract was, in fact, recordable that the Sponsor included a non-recordation provision in Section 31 of the Contract[13] stating: "Purchaser may not record this Agreement or a memorandum thereof." Further, the Property Report also indicates that the Contract would be recordable but for the recordation prohibition contained in it. (Ex. 4, p.6).[14] Indeed, Mr. Kravet confirms in his affidavit that, but for this prohibition, his company could have recorded the Contract based on the description of the property contained therein. (Kravet Aff. ¶7). Clearly, absent this provision, plaintiffs, as well as any other purchaser, could have recorded the Contract and thereby obtained a lien against the Condominium Building's real property. See Weiss v. Alard, 150 F. Supp. 2d 577 (S.D.N.Y. 2001).

In Weiss, the plaintiff contracted to purchase the "top floor" of a proposed condominium, before any condominium plan was even filed with the New York Attorney General. When the seller refused to honor that contract, the plaintiff brought an action and filed a notice of pendency against the block and lot of the building to protect her interest in the contracted for condominium unit to be created. The condominium developer moved to vacate the notice of pendency arguing that it was improper because it was in effect recorded against the whole building and the plaintiff

---

[13] In conformity with the usual practice, the Sponsor included a non-recordation provision in all of the contracts here because the recordation of an individual purchaser's contract would place a lien against the property and would constitute a default under the Sponsor's construction loan documents. Further, the existence of such liens would make the closings of every unit much more difficult and expensive because the Sponsor and purchaser would need to obtain waivers of every purchasers' lien against the property each time there was a closing for the purchase of an individual unit. In no place do the Regulations prohibit or restrict the use of such a non-recordation provision, and, in fact, they specifically contemplate its use. See Reg. 1710.109(d)(1). We note that plaintiffs are not complaining about the existence of this provision in the Contract.

[14] Specifically, the Property Report states on page 6: "Under New York law, the recording of the Agreement could protect you from other contract vendees and certain future creditors of Developer. However, under the terms of the Agreement, neither the Agreement nor any short-form summary thereof may be recorded in the Office of the New York City Register, County of New York and any recording of the Agreement by you in violation of the provisions of the Agreement is a breach of the Agreement."

had at most an interest only in one portion of the condominium to be developed thereon.  The Court denied the developer's motion and allowed the plaintiff's lien against the property to remain.  The Court noted that the lien was only filed against the plaintiff's interest in the property because the notice of pendency referred to the plaintiff's interest in the building's "top floor" and utilized "the most specific numerical reference available at the time of filing on the land and tax map of New York County".  Id. at 581-582.  Thus, the notice was validly recorded against the property to protect the plaintiff's claimed contract rights to her unit in the condominium to be developed, i.e., even though it lacked the block and lot number of the to-be-built unit, in the language of §1703(d)(1), it was in a form acceptable for recording.  This alone should be the end of the inquiry.[15]

Moreover, contracts in New York City for the purchase of a unit in a condominium building under construction (like the contracts at The Brompton) *cannot, by definition,* ever contain lot numbers for the units being purchased.  Specifically, under the Condominium Act, lot numbers are assigned to the units only once the Sponsor files and records the condominium declaration, and it cannot be filed until the development is totally built. See NY Real Property Law §339-p.  To be able to file the declaration and obtain tax lot numbers, a sponsor must file with the New York City Register a copy of the floor plans for the building accompanied by a verified statement of a registered architect or licensed engineer certifying that these floor plans "fully and fairly depict the layout, location, unit designations and approximate dimensions" of

---

[15]  Wholly apart from the foregoing, the Contract was, in fact, in a form acceptable for recording, subject only to the addition of the actual tax lot number for the Unit -- again, information that was not available until the Building was built and the declaration filed and approved.  Stated simply, the Disclosure Act requires only that the Contract be in "form acceptable for recording" -- which does not preclude the absence of certain specific information to be added at a subsequent point.  In fact, the *form* of the description contained in the Contract was certainly acceptable as the Sponsor was not instructed to make any changes after its submission to HUD.  As discussed above, among the many documents filed with HUD for review upon registration of the project, were the Contract form and the documents incorporated into it, including the Condominium Plan and the form of deed used to convey the Units.  HUD never notified the Sponsor that it found the *form* of Contract, including the *form* of legal description of the unit, to be materially inadequate under the Statute and the Regulations. See Section 1706(b).

the units "*as built*." (Id. emphasis added)  Only after this filing is reviewed and accepted by the

Real Property Assessment Bureau of the City of New York is the declaration recorded and are

individual tax lot numbers assigned for each condominium unit.  Because of this, no contract for

the purchase of a unit in a condominium building being constructed in New York City (and many

other localities) can ever, by definition, contain the recording information for the declaration or

the tax lot number for the specific unit being purchased.[16]

For this reason, not only do the Statute and Regulations *not* require that the tax lot

number be contained in the contract, but in the Regulations HUD set forth the specific

disclosures that developers need to provide when such information cannot be provided under

state law at the time of contract.[17] For example, Regulation 1710.109, "Title to the property and

land use", describes the various statements that the developer must include on these issues and at

subdivision (g)(1), entitled "Plats"[18], states:

> (ii) Have plats covering the lots in this Report been recorded? . . .

---

[16]  Plaintiffs contend (Br. at 19,fn 12) that as NYRPL §339-p technically permits the filing of a declaration without certified "as built" floor plans, the Sponsor could have filed the declaration here before entering into any contracts and thus provided purchasers with the declaration recording information.   However, even if permission for such an unusual filing could have been obtained from the New York City Register's Office, the Sponsor would still not have been able to provide tax lot numbers for the units as such numbers are assigned only after the certified, "as built" floor plans are filed and approved by the Real Property Assessment Bureau of the City of New York ('RPAB')".  Indeed, in that same footnote plaintiffs concede that the "as built floor plans and the designated tax block and lot numbers will eventually have to be filed before unit deeds are issued".  Thus, even if such a rarely allowed pre-construction filing of the declaration could have been made, it would still not have enabled the Sponsor to include in a pre-construction contract all of the information which plaintiffs contend, incorrectly, is required under the Statute.

[17]  Regulations 1710.100 et seq. detail the items, the disclosures and the warnings that a sponsor must include in its Statement of Record and Property Report.  And to state the obvious, it is black-letter law that HUD's interpretation of the Disclosure Act should be given enormous weight. See *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 Sup. Ct. 295, 307 (1980) (interpretation of federal statute by agency charged with administration of the statutory scheme is afforded great deference by the courts); *Pugliese v. Pukka Development, Inc.*, 550 F.3d 1299, 1305 (11th Cir. 2008) (Evidence of an interpretation of the Disclosure Act by HUD, the agency entrusted with administration of the Statute, is entitled to "substantial deference" by the Court").

[18]  The on-line dictionary Wikipedia, defines a plat as follows: "**plat** consists of a map, drawn to scale, showing the divisions of a piece of land. . . City, town or village plats show subdivisions into blocks with streets and alleys. Further refinement often splits blocks into individual lots, usually for the purpose of selling the described lots; this has become known as subdivision. After the filing of a plat, legal descriptions can refer to block and lot-numbers rather than portions of sections. In order for plats to become legally valid, a local governing body, such as a public works department, urban planning commission, or zoning board must normally review and approve them."

343500-5-W

16

> If they have not been recorded, is the description of the lots given
> in this Report legally adequate for the conveyance of land in the
> jurisdiction where the subdivision is located?  If it is not, include a
> statement to the effect that the description of the lots is not legally
> adequate for the conveyance of the lots and that it will not be until
> the plat is recorded.[19]

Clearly, the agency recognized that in many jurisdictions (including this State) the plans and "plats" for the condominium will not have been recorded (because they cannot be), and the division of the condominium's existing lots into separate tax lots for each unit will not have occurred (because State law proscribes it), as of the time the contract is entered into and that, as a consequence, the legal description of the unit may not be legally adequate for conveyance of the unit.  Because of this, rather than prohibit a sponsor from entering into contracts until the conveyable description is obtainable (i.e., upon the completion of construction), and rather than instruct a sponsor to tell purchasers that they have a two year right to revoke under §1703(d)(1), the Regulation simply instructs sponsors to include a statement in the Property Report which advises purchasers that the declaration has not been recorded and the legal description is not yet legally adequate for conveyance of the Units.  Here, the Sponsor followed the instructions in this Regulation to the letter and included such a statement in the Property Report.  (Ex. 6 at 9-10).

Similarly, Regulation 1710.209(g)(1)(ii), pertaining to information a sponsor must include in the Statement of Record, also contemplates that the declaration may not be filed and tax lots assigned, and so instructs sponsors:

> If the plat has not been approved by the local authorities nor
> recorded and if it is not unlawful to sell lots prior to final approval
> and recording, submit a map which has been prepared to scale and

---

[19]  In strict compliance with the Regulations, the Property Report (Ex. 4 at 9-10) discloses that "[t]he Floor Plans and Declaration [of Condominium] are subject to the review and approval of the Real Property Assessment Bureau of the City of New York ('RPAB')" and on the following page, in bold block capital letters, the Property Report states: "Neither the floor plans nor the declaration have been submitted to the RPAB. Until the floor  plans are filed and recorded the description of the units is not legally adequate for the conveyance of the units. Thereafter each unit will be legally described by reference to its unit and tax lot number as set forth in the recorded declaration and filed floor plans."

which shows the *proposed* division of the land…. (emphasis added).

There are numerous other Regulations instructing sponsors on how to proceed under the Disclosure Act when the declaration cannot be filed prior to entering into contracts. See e.g., Reg. 1710.208(d)(2) (general plan of subdivision submitted to HUD "must identify the various *proposed* sections or blocks within the subdivision") (emphasis added); Reg. 1710.209(a)(4)(i) (asking sponsor to identify the government agencies which regulate "the *proposed* division of the land…") (emphasis added); Reg. 1710.209(a)(5) ("state whether it is unlawful to sell lots prior to final approval and recording of a plat map in the jurisdiction…").

It bears emphasis that the Regulations do not in any place prohibit contracts in developments where a legal description of the unit sufficient for *conveyance* cannot yet be obtained under the law of the local jurisdiction, nor do the Regulations anywhere state that such contracts at all violate the Disclosure Act.  Most significantly, however, the Regulations do not require sponsors to advise purchasers in the Property Report, in the contract, or any place else, that when the full legal description of the unit needed for *conveyance* is unavailable at the time of contract, the purchaser has a two year right of revocation under §1703(d).

In contrast, the Regulations do require sponsors to include, in *both* the Property Report and the contract, statements which advise purchasers that (a) in all events they have an absolute right to revoke the contract within seven days after signing, and (b) if they were not provided with a copy of the Property Report before signing the contract, they have a two year right of revocation.  Reg. 1710.105(c).  Here, the Sponsor did provide such statements.  As stated above, because the Contract was recordable using the property description then available, the Sponsor had no reason to, and did not, advise purchasers of a revocation right under §1703(d).

We respectfully submit that the fatal flaw in plaintiffs' argument is their effort to conflate

(a) the language in §1703(d)(1) providing a purchaser with a right of rescission if the *contract* is not in form acceptable for *recording*, with (b) the language of the Regulations setting forth the disclosures that must be given if the description is insufficient for a *deed* to *convey* the unit.[20] There is no basis for this equivalency and, we submit, the very fact that different terms are used shows that they were intended to deal with different issues.  Section 1703(d)(1) makes clear that it must be evident from the contract what it is that the purchaser is contracting for: the unit must be identifiable and the contract must be in a form that can be *recorded*.  As noted previously, that is clearly the case here as the Contract *is* in a form that can be recorded.  In sharp contrast, the Regulations spell out that if the unit cannot be *conveyed* until the specific block and tax lot numbers have been assigned, there is no statutory violation, but the sponsor must give notice of that fact in the Property Report.  Simply stated, there is no suggestion in the Statute, in the Regulations, or anywhere else for that matter, that if a sponsor makes the disclosures in the contract and the Property Report required by the Regulations, a purchaser still has the right to revoke his contract.  Indeed, it is nonsensical to suggest that if a sponsor makes all these very extensive required disclosures, a purchaser would nevertheless have the same two-year right to revoke as if the Property Report was never delivered.

As the Regulations indicate, by making the required filings and disclosures to purchasers when the full conveyable legal description is unavailable, sponsors thereby satisfy the requirements of the Disclosure Act and thus, have no need to advise purchasers of a §1703(d) revocation right as long as the contract contains a description that allows it to be recorded.  By contrast, it bears repeating that there is no support whatsoever in the Statute, the Regulations or

---

[20]  Plaintiffs' confusion between the two is exemplified by its repeated reliance (Pl. Br. at 1, 12, 13, 14, 15, 17, 18) on New York Real Property Law §339-o. However, that section by its terms expressly addresses the information required for the recordation of *deeds conveying* (or certain leases for) condominium units. That section obviously has no applicability to *contracts* which, as noted, can be recorded before a declaration of condominium is filed.

in any HUD ruling for plaintiffs' assertion.  Further, in the forty years since the Statute was

enacted, there have been no reported decisions from any federal or state court anywhere in the

United States that has interpreted §1703(d) as plaintiffs urge here and allowed revocation simply

because the legal description obtainable under local law at the time of contract was insufficient

for conveyance.[21]

It bears emphasis yet again that every condominium development in New York with over

100 units has for years complied with the Statute by making the disclosures in the Property

Report concerning unit conveyances set forth in the Regulations.  At no time has HUD or any

court ever stated that such compliance was insufficient, or that the absence of block and lot

numbers entitled purchasers to a two year right of revocation under §1703(d).  And,

significantly, if plaintiffs' position were accepted, condominium development in New York

would be virtually halted because there are few, if any, developers who could ever obtain

adequate financing to develop a project without the ability to obtain binding contracts during

construction.[22]

---

[21] Plaintiffs' reliance in their brief (at 15) on an unreported decision from the district court in Florida, *Joeveer v. 1800 Club, Ltd.*, No. 1:08-cv-20412-AJ (S.D. Fl. 2008), as support for their interpretation of §1703(d)(1) is totally misplaced as that decision was based entirely on Florida law. In fact, a review of that decision reveals that the Court there merely held that the complaint could not be dismissed on a Rule 12(b)(6) motion because the defendant had not cited any authority under Florida law showing that the contract could be recorded without a recorded declaration of condominium. Here, in sharp contrast, it is crystal clear that under New York law plaintiffs' Contract was in fact recordable in the New York County land records based on the legal description of the property set forth therein.

[22] Moreover, few, if any, purchasers would be able to obtain a mortgage enabling them to purchase a unit. Under the guidelines issued by Fannie Mae, the government backed mortgage financing company that is ultimately responsible for insuring over seventy percent of all residential mortgages, no lender may give a mortgage for the purchase of a condominium unit unless seventy percent of the units in the condominium have already closed or are under a binding contract. http://online.wsj.com/article/SB123733304341863319.html ("The government-backed mortgage-finance company [Fannie Mae] stopped guarantying mortgages in condo buildings where fewer than 70% of the units have been sold, up from 51%. . . Fannie says the new rules protect borrowers from buying units in buildings that have a high risk of failure . . ."). Thus, if plaintiffs' interpretation of the Statute were accepted and all purchasers in New York had a two year right of revocation for their contracts, it would be nearly impossible for any purchaser to obtain a mortgage in a newly developed condominium in New York, because the condominium, by definition, could not obtain binding contracts for any of the units -- let alone for 70 percent -- until long after it was completed. With both purchasers and developers largely unable to obtain financing, new condominium construction would come to a halt. As the Regulations clearly indicate, such a result was never the intention of the Statute.

In short, given the complete absence of support for plaintiffs' position, coupled with the

clear language of the Regulations, as well as the draconian impact which acceptance of it would

have on the entire condominium industry, plaintiffs' position should be rejected.[23]

## B.     The Claimed Misdescription of the Condominium Lots

Plaintiffs' second claimed Disclosure Act violation under 1703(d)(1) appears to be that

the Building, in which their Unit was located, was somehow "misdescribed" because even

though *all* documents correctly stated that the Building consisted of three parcels, and even

though the proper tax lot numbers of the three parcels were correctly delineated in *all* of the

documents, in one of the pages furnished to plaintiffs (an exhibit to the proposed declaration) it

was stated that Parcel 1 -- which is comprised of tax lots 4, 45, 46, 47 & 48 -- included the space

in those lots that lied at "90.52 above the plane" (i.e., 90.52 above ground level) when what

should have been stated was that it included the space in those lots that lied 90.52 feet above the

plane and below. This "argument" is totally specious, especially given the fact that a building

can obviously not commence in mid-air and further, because all of the Plan documents made

crystal clear that the building included two commercial units which were located precisely in that

area below 90.52 feet (i.e., at ground level).

Moreover, as discussed above, the Statute requires that the legal description in the

---

[23]   Plaintiffs request for permission to replead (Br. fn 10) to assert a claim for damages if the Court decides that they do not have a right of revocation under §1703(d)(1), should be summarily rejected. Once the Court determines that plaintiffs do not have a revocation claim because, as detailed above, the Sponsor complied with §1703(d)(1) by including a description of the property which clearly identified the Unit and which made the Contract acceptable for recording in New York County's land records, plaintiffs cannot, by definition, have a claim for damages for a violation of that section. *Murray v. Holiday Isle, LLC*, 620 F. Supp. 2d 1302 (S.D. Ala. 2009), the only case cited by plaintiffs as "support" for their request, in fact offers no support at all. There, the Court simply held that where a developer fails to provide a purchaser with a copy of the Property Report pursuant to §1703(c), the purchaser may have a claim for both damages and revocation. *Murray* certainly does not hold, as plaintiffs contend here, that after its claim for revocation has been dismissed because no violation of the Statute has been found, a plaintiff may then assert a claim for damages based on the same alleged violation.

Contract be in a *form* capable of being recorded. Here, the language in *all* of the documents correctly recited the existing tax lot numbers for the property on which the Building was located. Thus, the inadvertent omission of the words "and below" in no way changed, or at all affected, the Unit or its description. Not only did the Unit remain identifiable, but, most importantly, the Contract could still have been recorded against the fully disclosed existing tax lots for the Condominium Building and thus, it still satisfied the requirements of §1703(d)(1).

Equally important is the fact that plaintiffs cannot claim they were in any way misled or harmed by what they are complaining about, or that the absence of the words "and below" was in any way material to their purchase, particularly in light of their sworn testimony that they did not even *read* the materials and that the only information they had respecting the Building was what their counsel told them (Ex. 6 at 16-18, 40-41; Ex. 7 at 32-33, 56). Indeed, wholly apart from that testimony, the Condominium Plan, including the proposed declaration itself, made perfectly clear in numerous places that the land on which the Condominium is to be located is comprised of *all* of the lots, *including all* of lots 4, 45, 46, 47 and 48 (i.e., the space in the area that was 90.52 feet above the plane, as well as the space below, which plaintiffs contend had been excluded). See, e.g., Ex. 5 at 16, 31 ("The Land . . . consists of Block 1531, Lots 4, 6, 43, 45, 46, 47 and 48"). Further, the Plan made clear in numerous places that the Condominium would contain the two commercial units on the ground floor in those very areas of the corner portion of the property that were below the area which was 90.52 feet "above the plane". See, e.g., Ex. 5 at 17 (Setting forth that the Condominium would include two commercial units and the location of those units); See Ex. 5 at 34 ("The Condominium will also initially include 2 Commercial Units - - Commercial Unit 1 which will be located on the 1st floor and cellar level of Building A and Commercial Unit 2 which will be located on the 1st floor and cellar level of Building A"); Ex. 5, Article 3 and 4 at 372 (Again stating that the Property includes two commercial units each on a

portion of the "Cellar Floor, First Floor and Mezzanine" of the Building); Ex. 5 at 291-293 (The floor plans of the Cellar and First floors of the Building --showing the exact location of the Commercial Units). The Plan, therefore, fully disclosed what the Condominium would contain.

Finally, not only is what plaintiffs are complaining about immaterial, and not only did plaintiffs not rely to their detriment on any claimed discrepancy but, if anything, under plaintiffs' contention, they were now receiving even *more* than they originally bargained for -- the inclusion of the ground floor level -- even though there was no increased property taxes or expenses. Certainly, under these circumstances plaintiffs cannot show that there was a *material adverse* change which they relied upon to their detriment.

The Courts have held that the Statute only applies to material misrepresentations or statements contained in the statement of record filed for a real estate offering. See *Bryan v. Amrep Corp.*, 429 F. Supp. 313, 317 (S.D.N.Y. 1977) (purchaser required to prove that "a material misrepresentation or omission existed in the statement of record at the time the property was sold."); *Price v. Owens-Illinois Development Co.*, 646 F. Supp. 314, 316 (M.D. Ga. 1986) (Disclosure Act violation occurs if  statement of record or property report "contain an untrue statement of material fact"... or "omit to state a material fact..."); *Gibbes v. Rose Hill Plantation Development Company*, 794 F. Supp. 1327, 1334 (D. So. Carolina 1992) ("If the property report's statement was untrue, the court must determine whether the untrue statement was one of material fact.");  see also *Stefan v. Singer Island Condominiums Ltd.*, 2009 WL 426291, at p. 8 (S.D. Fla. 2009) (In deciding whether there was a violation of §1703(d), the court needed to decide whether "the difference between the statutory language and the language of the contract is material" and "whether the difference actually affected the exercise of plaintiff's rights. . .").  Under the Disclosure Act, "the test of materiality is whether a reasonable investor might have considered the omitted fact or erroneous statement as important in making a decision". *Paquin*

*v. Four Seasons of Tennessee, Inc.*, 519 F. 2d 1105, 1109 (5th Cir. 1975), <u>cert denied</u>, 425 U.S. 972, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976).  Here, plaintiffs cannot meet this test for materiality as, by their own admission, the minor modification to the underlying property's description in the filed declaration in no way impacted their decision to purchase.

**C.      The Contract Satisfied The
<u>Requirements of §1703(d)(3)</u>**

Plaintiffs' third and final contention is that apart from §1703(d)(1), they are also entitled to rescind the Contract under §1703(d)(3) and Regulation 1715.4(b).  This section of the Statute states that contracts must provide:

> that, if the purchaser or lessee loses rights and interest in the lot as a result of a default or breach of the contract or agreement which occurs after the purchaser or lessee has paid 15 per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, the seller or lessor (or successor thereof) shall refund to such purchaser or lessee any amount which remains after subtracting (A) 15 per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, or the amount of damages incurred by the seller or lessor (or successor thereof) as a result of such breach, whichever is greater, from (B) the amount paid by the purchaser or lessee with respect to the purchase price of the lot, excluding any interest paid under the contract or agreement.

The obvious purpose of the Statute is to ensure that in connection with sales subject to the Disclosure Act, a sponsor is limited to obtaining from defaulting purchasers the greater of 15 percent of the purchase price or the actual damages it sustains.  Consistent with the Statute, Regulation 1715.4(b) states that "no damages may be specified in the contract or agreement, except a liquidated damages clause not exceeding 15 percent of the purchase price of the lot."

Here, the language of the Contract totally comports with the requirements of both the Statute and this Regulation. Specifically section 12(d) of the Contract plainly states:

> to the extent that the sale of the Residential Units is not exempt
> from the provisions of the Interstate Land Sales Full Disclosure

> Act, the amount of the Deposit to be retained by the Sponsor upon Purchaser's failure to cure a default … will be the greater of (i) fifteen percent (15%) of the Purchase Price (excluding any interest owed) or (ii) the amount of damages incurred by Sponsor due to the default.

Notwithstanding this language, plaintiffs nevertheless assert that the Contract does not comply with the Statute because it also contains an alternative liquidated damages provision, section 12(c), which would be applicable in the event the Disclosure Act did not apply to the sale of the Unit, and which provides for liquidated damages upon purchaser's default in the amount of twenty percent of the purchase price. According to plaintiffs, the Contract does not comply because merely having these alternative clauses in its text may "confuse" a buyer as to his rights.

Once again, there is no merit to (or case law support for) this contention. Plaintiff Bacolistas testified that he did not recall even having an understanding as to how much of a deposit he would forfeit if he defaulted under the Contract and that he was not confused about anything relating to the Contract after his lawyer provided advice and explanations of its terms. (Ex. 7 at 69-70). That alone should be the end of the inquiry. Moreover, the form of the Contract containing these alternative damages clauses was submitted to HUD and it never notified the Sponsor that the form was materially deficient in any way. Indeed, the inclusion of such alternative liquidated damages clauses in the form of contract is by no means unusual and is, in fact, necessary given that the form to be used for all sales must be submitted to HUD at the time the development is registered. Even though an overall development may be subject to the Statute and registered with HUD, individual purchasers may still fall within one of the Statute's regulatory exemptions and not be subject to its requirements. Because of this, the form contract submitted to HUD as part of the Statement of Record needs to contain both clauses since either

may be applicable, depending on the status of the purchaser.[24]

As the Property Report given to each purchaser here clearly indicates that the development is covered by the Disclosure Act,[25] purchasers knew when they signed their contracts that the Act and, therefore, the 15% liquidated damages clause in 12(d), applied unless they themselves were specifically exempt.  Whether they were exempt would depend on information within their own knowledge, not the Sponsor's, and therefore, there is no way the alternative clauses could be confusing or misleading to an individual purchaser.[26]

In short, as the Contract contained the very provision required by the Disclosure Act, plaintiffs' claim that they are entitled to revoke it under §1703(d)(3) should be dismissed.[27]

## CONCLUSION

As plaintiffs defaulted under the Contract and as their claims are legally insufficient (a) plaintiffs' motion for summary judgment should be denied, and (b) defendants' cross motion, for summary judgment dismissing the Complaint and awarding the Sponsor the reasonable

---

[24] For example, Regulation 1710.14(a)(3) provides that units sold to a person engaged in a bona fide land sales business are exempt from the Statute. HUD's Guidelines to the Statute and the Regulations (at http://www.hud.gov) state that the exemption is to be applied on a "lot by lot basis" -- a contract by contract basis. Depending on the purchaser, the appropriate liquidated damages would be different.  For those covered by the Disclosure Act, the 15% limitation would apply while for those exempt, the 20% limitation would apply.  Accordingly, the form contract submitted to HUD for approval had to contain such alternative provisions in 12(c) and 12(d).

[25] Not only does the front page of the Property Report indicate that "Federal Law requires that you receive this Report prior to signing a contract or agreement to buy or lease a lot in this subdivision" but the last two pages clearly reflect that the Property Report has been filed with HUD and that "[if] any representations are made to you which are contrary to those in this Report, please notify HUD Interstate Land Sales/RESPA Division".  (Ex. 4).

[26] Any claim of confusion is belied by the plain and direct language in the Property Report (Ex. 4 at 7),  given to plaintiffs before they signed the Contract, which states that "if you paid fifteen (15%) of the purchase price *or more* at the time of your default and you lose the right to purchase the Unit, you may be entitled to a refund of a portion of your deposit(s) if and to the extent required under Section 1703(d) of the Interstate Land Sales Full Disclosure Act. *Under 1703(d) of the Interstate Land Sales Full Disclosure Act, we must refund to you the remaining amount of the total deposit(s) after subtracting the greater of (i) 15 percent of the purchase price (excluding any interest owed) and (ii) the amount of the actual damages resulting from the default incurred by us*" (emphasis added).

[27] Plaintiffs' request (Br. fn.16) for permission to replead to assert a damages claim if the Court decides that they have  no right of revocation under §1703(d)(3), should, like their previous request (fn. 22 *supra*), be summarily rejected for the same reasons.

attorneys' fees incurred by it in this action as provided for in the Contract,[28] should

be granted.

Dated: New York, New York
       March 18, 2010

KATSKY KORINS LLP

By: _____
      Mark Walfish
      Thomas M. Lopez
Attorneys for Defendants
605 Third Avenue
New York, NY  10158
(212) 953-6000

---

[28] Paragraph 35 of the Contract provides that "Purchaser [i.e., plaintiffs] shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder".